Anthony T. LEE et al., Plaintiffs,

United States of America, Plaintiff-Intervenor and Amicus Curiae,

National Education Association, Inc., Plaintiff-Intervenor,

v.

MACON COUNTY BOARD OF EDUCATION et al., Defendants.

Civ. A. No. 70–251.

United States District Court,
N. D. Alabama, S. D.

Jan. 4, 1971.

See also, 5 Cir., 429 F.2d 1218.

Gray, Seay & Langford, Montgomery, Ala., Jack Greenberg, NAACP Legal Defense and Education Fund, New York City, for plaintiffs.

Wayman Sherrer, U. S. Atty., Birmingham, Ala., Gray, Seay & Langford, Montgomery, Ala., for plaintiff-intervenor-NEA.

Smith, Bowman, Thagard, Crook & Culpepper, Montgomery, Ala., for defendants.

## MEMORANDUM OF DECISION AND ORDER

POINTER, District Judge.

By decree dated July 14, 1970, the Limestone County Board of Education was ordered by a three-judge panel to place in effect by the commencement of the fall school term a plan, prescribed therein, for conversion to a unitary school system. The order contained almost verbatim the provisions for "desegregation of faculty and other staff," "majority to minority transfer policy," etc., set forth in Singleton v. Jackson Municipal Separate School Dist., 5 Cir., 419 F.2d 1211 (1970). Copies of the order, which also transferred the cause to this court for any further proceedings, were sent by certified mail to the Superintendent and each member of the Board.

On September 16, 1970, plaintiff-intervenor National Education Association, Inc. filed with the court a Motion to Produce and a Motion for Temporary Restraining Order and for Preliminary and Permanent Injunctions. The gist of the latter motion is that the Board was not adhering to the requirements of the July order regarding desegregation of faculty. On December 3, 1970, plaintiff-intervenor the United States filed a Motion for Supplemental Relief, specifying in some detail alleged violations of the requirements for desegregation of faculty and also charging that the at-

tendance zone requirements were being evaded.

An evidentiary hearing was held on these motions[1] on December 9, 1970. Post-hearing briefs have been filed by the United States and by the defendants at the request of the court. There are four items of controversy for decision by the court—faculty assignments; demotion of principals; hiring practices; and cross-zone attendance.

## I. FACULTY ASSIGNMENTS

▮ For the 1970–71 school year approximately 82% of the faculty members in the system are white, and approximately 18% black. Under the July order and the *Singleton* decree the percentage of white faculty members at each school should be "substantially the same" (as 82%). At the New Hope school, however, only two of its fourteen teachers this past term were white—just the reverse of what was required. This error, of course, pushed the ratio of white teachers at some other schools above the prescribed level—principally at the Ardmore and West Limestone schools.

All parties now understand that the situation at the New Hope school is in violation of the court order, and the defendants have indicated that the matter can be corrected by the commencement of the second semester in January. It is therefore ordered, adjudged and decreed that the defendants effect such reassignments of teachers within the system that by February 1, 1971, and for the balance of the school year, there be at each school approximately 82% white faculty and approximately 18% black faculty—and in particular that at the New Hope school for the second semester composition of faculty be eleven or twelve white members and two or three black members.

---

[1] At the hearing the court directed that the "Motion to Produce" be treated as a request under new Rule 34, F.R.Civ.P., but that the defendants should make their response to the request by December 21st.

## II. "DEMOTION" OF PRINCIPALS

█ Of the seventeen schools operated during the 1969–70 school year, five were ordered closed by the July order as necessary for the disestablishment of a dual school system. The order required the Board to develop and make public "objective and reasonable nondiscriminatory standards" to govern the selection of persons to be "demoted" incident to the conversion to a unitary school system, to record and preserve the evaluation of personnel under such non-racial criteria, and to furnish a report to this court by August 15th of such actions.

No such report was made to the court —that is, until December, when this hearing was held. At that time the Board presented as its criteria a policy statement which, *inter alia*, provided that principals are employed

> in keeping with their certificate, experience, morals, honesty, character, ability to handle money, promptness to pay debts, and ability to discipline students, past performance in carrying out assignments, ability to get along with students and faculty, appearance of school plant and grounds, record in community as to participation in community affairs, dedication to the profession, and ability to lead.

The above standards were not used to decide which principals would be retained for 1970–71 and which would be "demoted." In fact no standards were used. Instead, a principal at a school closed by the order lost his job; a principal at a school left open by the order kept his job. Since four of the schools closed were "Negro schools," the number of black principals in the system was reduced by four (from five to one). According to the Superintendent, the only "vacancy" was at Johnson Junior High —this spot created by the resignation of the white principal was then filled by the employment of a new white principal *prior* to the receipt by the Board of the court's July order.

This position of the Board—that it was unnecessary to use non-racial objective standards because there were no vacancies arising after receipt of the order —is not in keeping with the court's directive. Indeed, the main thrust of the provisions for desegregation of the faculty was directed towards the problem created by implementing the order itself. It provides in part:

> If there is to be a reduction in the number of principals * * * which will result in a * * * demotion of *any* such staff members, the staff member to be * * * demoted must be selected on the basis of objective and reasonable nondiscriminatory standards from among *all* the staff of the school system. * * * "Demotion" * * * includes any reassignment (1) under which the staff member receives less pay or has less responsibility * * * [or] (2) which requires a lesser degree of skill than did the assignment he held previously. * * * In the event that the school system, in connection with its conversion to a unitary system, plans to * * * demote personnel, as * * * hereinabove used, a report * * * shall be filed with the Court and served upon the parties by August 15, 1970 * * *. (Emphasis added.)

The defendants knew during the Spring of 1970 that some schools would be closed prior to the 1970–71 year. The only real issue in any doubt was whether Trinity High would be closed or left open. It was clear that a minimum of four schools would be closed. The defendants also knew, or should have known, that a requirement such as that quoted above would be imposed by the court to govern the selection of which principals should be "demoted"—the *Singleton* decision had been issued in December 1969, and the desegregation plan for Limestone County, containing such provisions, had been filed with the court in February 1970. Accordingly, at the time the new principal was employed for Johnson Junior High (in early summer, 1970), even though perhaps before the Board had received copies of the fi-

nal July order, the Board should have known that there was no need to hire a new principal—that instead it was going to be faced with a decision shortly of paring down the current principals.

The sixteen principals should have been evaluated by the Board under non-racial objective standards developed by it, and twelve selected for retention as principals. The four not selected—or, in the language of the July order, "demoted"—then would have under the order a limited preferential right to promotion in the event of subsequent vacancies.[2] The Board asserts that the most qualified (from among the group consisting of himself and the three demoted black principals who have remained in the Limestone system[3]) is the white man recruited for the Johnson Junior High position. The fallacy is that (1) the Board, by its own admission, did not make any such comparative evaluation at the time of making its decision, and (2) the persons to be evaluated under the standards selected should have included only those who were principals in the system in 1969–70, and (3) the Board was not free to recruit a new man to fill such a position until it had first offered the job to those 1969–70 principals being demoted.[4]

The relief must be tailored to fit the particular situation—mindful of the fact that the court has no special expertise in making comparative evaluations of teachers and principals, and indeed has only the limited vision provided by a short period in a courtroom. After carefully reviewing the testimony, the exhibits, and the briefs, the court has reached the following conclusions (and the same are hereby declared to be the order and decree of this court):

(1) Charles Garner, the current principal at Johnson Junior High shall be assigned by the defendants to other duties, teaching or administrative, at Johnson Junior High or elsewhere in the system, but without any reduction in pay for the balance of the school year.

(2) The defendants shall, using the criteria contained in the policy statement filed in this court and previously quoted in this opinion, select one of the following to be principal at Johnson Junior High School effective with the commencement of the second semester of the 1970–71 school year and in no event later than February 1, 1971: Benjamin L. Crittenton, Acrus B. Crook, Jr., and Thomas J. Witt. The two of them not selected as prin-

2. The order, in the same words as *Singleton*, gives the demoted person a preferred position in front of *recruited* persons of another race or color. As among those demoted, no preference is established by the order—this would be a matter for the Board to develop using non-racial objective criteria. Where, as here, the demoted consist of persons of both races, the impact of the language is to prevent recruitment of new persons of either race until the job has first been offered to all those demoted.

3. The fourth demoted black principal left the Limestone system upon learning that he would not be kept as a principal. He has since found employment with a larger salary, and no less prestige, responsibility or status, with Alabama A & M. This man, the holder of an Ed.S. degree and an AA certificate, would in all likelihood have been one of the top twelve principals in the system based

upon any combination of nondiscriminatory reasonable standards. The failure of the Board to follow the requirements of the order has resulted in the unfortunate loss to the system of this principal.

4. Such persons could be by-passed only if they were not "qualified" for the position —not if they were merely "less qualified." The defendants have not here really contested the fact that those demoted were all qualified—indeed, they had been willing to treat them as qualified while they were operating a dual school system. They have noted that the man selected has a Master's degree in school administration, but two of the four by-passed also hold Master's degrees (one in Agricultural Education, one in Elementary Education). In concluding that those demoted are not "unqualified," the court does not intend to imply that they are less qualified than the man selected by the Board.

cipal at Johnson Junior High together with Edwin Spencer (the "demoted" white principal) shall, however, if they remain employed in the Limestone County system, be offered a promotion to principal at the time the next three vacancies occur in principalships within the system (whether such vacancies arise from death, resignation, or discharge of the current principals, or otherwise). The defendants shall moreover pay to the four demoted principals who have remained in the system, retroactive to the commencement of the 1970–71 school year, a salary supplement such as to make their compensation equal to that which they would have been receiving had they remained as principals during the year—such supplements to continue until they are offered a promotion back to principal (or until their employment in the Limestone County system is earlier terminated).

## III. HIRING PRACTICES

At the hearing Superintendent Pettus indicated that only one or two of the some 65 new teachers hired during the past two years were black. It is recited in defendants' brief, however, that according to a subsequent study thirteen black teachers or teachers-aides were hired the past two years. In view of the fact that Pettus certified to the Alabama Department of Education that 27 new teachers had been employed—all of whom were white—between the beginning of the 1969–70 year and the beginning of the 1970–71 year, it must be assumed that the black teachers for whom the defendants are seeking "credit" were hired prior to the start of the 1969–70 school year, and at a time when a dual school system was being operated in Limestone County.

It is clear to the court—as reflected in the official statement of policy filed with the court,[5] and as admitted by the Superintendent [6]—that the Board is following a hiring policy which is not required by the court order and which in fact is discriminatory. There is no requirement that the faculty ratio be the same as that of the student ratio in the system—the effort to follow such a practice makes for hiring based on color, rather than hiring based on "color blind" qualifications. This past year such a precept has discriminated against Negro applicants solely on account of their race; it could just as well in future years, depending upon resignations, etc., discriminate against white applicants.

The Court is convinced that the Board's error was not willful and malicious—that it was acting upon a sincere belief (however mistaken) that it was required to maintain its faculty ratio at the same point as its student ratio. Nor is the court convinced that the error should be corrected (as suggested in the government's brief) by at this time requiring the Board in future years to *hire* a given percentage of black teachers each year (e. g., percentage of black students in system, or percentage of black population in system area). Such a hiring policy would be of the same species as that previously used by the Board—a quota policy which could prevent blacks (or whites) from being hired on account of their color. Such a step should be taken only upon the clearest evidence of a need to do so—The court is instead of the opinion (and so orders) (1) that the defendants cease using any racial quota or percentage in the hiring of employees, and (2) that the defendants furnish to the other parties to this litigation (as well as maintain for inspection by any other inter-

5. "Prior to the 1954 Civil Rights Act it was the policy of the Board to employ the same percentage of Negro teachers as students enrolled in the system. This policy is still in effect and today the percentage or ratio remains the same."

6. He testified that he thought the system was required to maintain a racial percentage in the faculty and that, to maintain that ratio, it was not possible to hire any black teachers for the 1970–71 school year.

ested person) semi-annual reports (spring and fall) showing vacancies to be filed; general qualifications and any special requirements for such vacancies; and the name, race, education, certificate, and experience of the applicants, including an indication as to those hired.

## IV. ATTENDANCE OUT OF ZONE

Shortly after the opening of school, the Board altered the line between the New Hope zone and the Mooresville Belle-Mina zone, the effect of which was to transfer some 80 black students from Mooresville Belle-Mina to New Hope. These students had attended Greenbrier School the previous year, Greenbrier (an all-black school) being one of those closed under the July order.

At the same time, some forty white students and some five or six black students living in the New Hope zone have been allowed—at least no one told them not to—to attend the Mooresville Belle-Mina school. Transfer of the black students would have been permissible if space was available under the "majority-to-minority transfer policy," *i. e.*, because blacks are in a majority at New Hope and in the minority at Mooresville Belle-Mina. The cross-zone attendance, however, by the white students is in direct violation of the July order.

The court is convinced that the change of zone lines was done by the Board as an expedient to avoid an overcrowding at Mooresville Belle-Mina, in the face of under-attendance at New Hope: with a physical capacity of 300 students, Mooresville Belle-Mina had in attendance some 370 students from its zone, while in the adjacent New Hope zone there were some 200 students in attendance at a school having a physical capacity of 330. In selecting the area to be lopped off, the Board, as might be expected, chose an area which would diminish the impact on white families.

At the same time, a study of the maps of the area indicates that, if some area is to be transferred from one zone to the other, the one selected might have been a logical choice for non-racial reasons (road patterns, geographical cohesion, etc.)

■■ The Board has been derelict in its responsibilities to the other parties to this action and to the court by unilaterally—and without even formally reporting after-the-fact—changing attendance lines. But the court is convinced that there was a need to change these lines—and to change them without undue delay—and is accordingly not disposed to reversing at this time the Board's action in this regard. Where it is possible to do so, the court should leave decisions of school administration to the designated school boards. Here it does not appear that the Board's action in the final analysis interferes with the establishment of a unitary system.

But the Board cannot allow white students residing in the New Hope zone to attend the Mooresville Belle-Mina school or any other elementary or junior high in the system. The same is true for any other attendance across zone lines—the only exception is under the "majority-to-minority transfer policy." The defendants are hereby ORDERED to take such steps as may be necessary to assure that, beginning with the commencement of the second semester of the 1970–71 school year, and in no event later than February 1, 1971, no student residing in Limestone County shall be permitted or suffered to attend a school in another attendance zone of the County. The only exception is under the "majority-to-minority transfer rule," and that exception is dependent upon space being available. The possibility of white flight, boycott, or criticism cannot justify continuation of a dual system. See Monroe v. Board, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).