Anthony T. LEE et al., Plaintiffs,

United States of America, Plaintiff-Intervenor and Amicus Curiae,

National Education Association, Inc., Plaintiff-Intervenor-Appellant,

v.

MACON COUNTY BOARD OF EDUCATION et al., Defendants,

(Muscle Shoals School System), Defendant-Appellee.

No. 71–2963.

United States Court of Appeals, Fifth Circuit.

Dec. 28, 1971.

Solomon S. Seay, Jr., Montgomery, Ala., Wayman G. Sherrer, U. S. Atty., A. Lattimore Gaston, Asst. U. S. Atty., David L. Norman, Asst. Atty. Gen., Brian K. Landsberg, Thomas M. Keeling, Theodore J. Garrish, Perry T. Christison, Attys., Dept. of Justice, Washington, D. C., for appellant.

H. Jack Huddleston, Sheffield, Ala., for defendant-appellee.

Before GEWIN, GOLDBERG, and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

This is a case of faculty fallout in the wake of desegregating the school system of Muscle Shoals, Alabama. In such situations human aspirations are sometimes thwarted by tides of history. Though we may not levee the tides completely, we can log our journey leaving as few professional heartaches as possible.

Charles Carter was removed in 1967 as principal of an all-black school pursuant to a court desegregation order that required the closing of his school. Lee v. Macon County Board of Education, M.D.Ala.1967. The white principals were retained or replaced with other white principals. From 1967 to 1971 principalships in three of Muscle Shoals' four schools became vacant. Charles Carter was not contacted regarding any of the vacancies, and each was filled with a white man or woman. In May, 1971, another principalship vacancy arose in the Avalon Middle School. Again, Carter was not appointed, the school board choosing instead a white assistant principal from the high school. Alleging that he was denied appointment because of his race in violation of the Constitution and of this court's directives, Carter appeals from the district court's denial of his motion for an order directing the Muscle Shoals school board to appoint him to a position tantamount to the one he had occupied prior to his demotion, specifically to the principalship of Avalon, and to restore to him any back pay and retirement benefits of which he had been unlawfully deprived because of the discriminatory practices of the board. We find that the school board has failed to comply with this court's procedures for the reappointment

of principals who are affected by desegregation orders, and we reverse.

After his school was closed in 1967, Carter, who had served as principal since 1959, requested that he be appointed either principal of another school or director of the Muscle Shoals Head Start program. He was not offered either position. Instead he was offered, and accepted, a position as teacher with the Head Start program. Carter testified that he had been told during several conversations with the superintendent in 1967 that this Head Start teaching position was the only position available to him in Muscle Shoals, although he was offered, and refused, two other positions in other areas of the state. That testimony is undisputed in the record, although the superintendent who formed the other end of these 1967 conversations regarding available positions died in 1970. Carter obtained a leave of absence from the school system in order to accept the position at Head Start. He taught in the Head Start program for three years, during which time he often expressed to the school board his continuing desire for another principalship or for a position equal to that which he had occupied prior to the desegregation order. Three principalships arose in 1969 and 1970, but Carter was not hired, or even consulted.[1] Prior to the 1970 school year Carter was informed by the new superintendent that his leave of absence could no longer be continued under Alabama law, and that he would have to return to the Muscle Shoals school system or resign altogether. Even though he had been passed over for principalships three times since 1967, Carter resigned from Head Start and returned to the school system in the hope that he might be placed in a position of responsibility equal to that which he had held as principal for eight years.

Carter holds a Master's Degree in School Administration; at the time of the hearing he lacked six hours of course-work before he was to receive a Master's Degree in Elementary Education. He is certified by the State Board of Education as qualified to serve as principal, assistant superintendent, guidance counsellor, social studies instructor, English instructor, and physical education instructor. He was assigned in 1970 as a physical education instructor. For the 1971 school year he was also assigned to teach a seventh grade social studies class.

Subsequent to Carter's return to the system and to his assignment as physical education instructor, the principalship of the Avalon Middle School became vacant.[2] Once again Carter requested that he be reinstated to a position tantamount to that which he had occupied in 1967, specifically to the principalship of Avalon. Once again the school board hired a white applicant, allegedly on the basis of "higher" qualifications.[3] This time Carter sued, and the National Education Association and the Department of Justice intervened in his behalf. Without going behind the school board's allegations that Carter was "less qualified" for a principalship than the white applicant, the district court denied Carter's petition for reinstatement as principal of Avalon, for back pay, and for lost retirement benefits. At the same time, the district court ordered the school board to file objective, non-racial criteria for the demotion and dismissal of principals and teachers, pursuant to this court's decision in Singleton v. Jackson Municipal Separate School District, 5 Cir.1970, 419 F.2d 1211, cert. denied,

1. In addition to the principalships, Carter was passed over in favor of white applicants for an assistant principalship, two positions as guidance counsellor, and two openings as coach.

2. The principal of Avalon, hired in 1969 over Carter, was dismissed one year later as "not qualified."

3. The present principal of Avalon has a Master's Degree in School Administration. He had served as assistant principal at the Muscle Shoals High School for five years, but had no experience as principal.

396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530, and to offer to Carter "the first vacancy in a principalship or assistant principalship for which he qualifies."[4] Because we conclude that *Singleton* has not been followed with regard to the Avalon principalship and because we doubt the district court's interpretation of *Singleton*, we reverse the denial of Carter's motion for immediate reinstatement, back pay, and retirement benefits.

It is clear that *Singleton* controls this case, but there is disagreement among the parties regarding *Singleton's* meaning and thrust. With regard to the administration and faculty correlatives to a school desegregation order, this court concluded in *Singleton*:

> ". . . [I]f there is any such dismissal or demotion [of principals, teachers, teacher-aides, or other professional staff employed by the school district], no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, *until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so*."

419 F.2d at 1218 [emphasis added].

For purposes of *Singleton*, Carter's "demotion" took place in 1967, when his old school was closed and his principalship terminated.[5] He was first demoted to Head Start teacher, later to physical education instructor. The school board implies some doubt that Carter was "demoted" within the intent of *Singleton*, pitching its suggestion on the ground that Carter's salary as Head Start teacher from 1967 to 1970 was higher than that he had drawn in 1967 as principal of the all-black school. From that difference in salary, the board argues that Carter voluntarily left the Muscle Shoals school system in search of higher remuneration, or, in the alternative, that Carter was not "demoted" because he was paid a higher salary as a Head Start teacher. The board's argument that Carter voluntarily left the school system ignores the record. Although we have no specific finding of fact regarding the voluntariness of Carter's assumption of the Head Start position in 1967, it is clear that the district court did not, by denying Carter any immediate relief, thereby hold that Carter had voluntarily removed himself from the Muscle Shoals school system. Had the district judge so concluded, Charles Carter would not be entitled to claim any succor under *Singleton*; yet the district judge ordered the board to comply with *Singleton*, as he read the case, in the board's dealings with Carter. Carter testified that from 1967 to 1970 he was not offered any position in the Muscle Shoals system. That testimony is uncontradicted.[6]

4. The part of Singleton relevant to the filing of criteria reads as follows:
 "Prior to such a reduction [in the number of principals, teachers, teacher aides, or other professional staff employed by the school district], the school board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district." 419 F.2d at 1218.

5. *Singleton* refers both to "demotion" and to "dismissal" of faculty or administrative personnel. There may be some disagreement with regard to whether Carter was dismissed or demoted, but there can be little question that one of the two did occur. We take the view that he was demoted, rather than dismissed, because he remained on a formal leave of absence from the Muscle Shoals school system during his tenure as a Head Start teacher. When assigned as physical education instructor, of course he was even more clearly within the school system and clearly demoted from his earlier position in the system as principal.

6. The school board simply states that the superintendent with whom Carter held a number of conversations on the subject of available positions died in 1970. It is clear even under Alabama law that the death of the superintendent does not

It is clear to us from the record that Charles Carter did not voluntarily leave the Muscle Shoals system, and his attendant right to seek a position of responsibility equal to that from which he was demoted, in favor of a higher salary. He made known his aspirations in 1967 to remain in the school system; he turned down offers to go to other school districts; and he continually made his aspirations clear to the school board on several occasions from 1967 to 1971. In final testimony in his real intent, Charles Carter resigned his Head Start position to return to the school system promptly upon being notified that he could no longer take leaves of absence and remain even formally within the system, knowing that the immediate result would be a loss of salary, at least pending his continuing search for appointment to a position commensurate to that which he had held for the eight years prior to 1967.

The school board's alternative argument that Carter was not "demoted" within the intent of *Singleton* because he received a higher salary as Head Start teacher than as principal of the all-black school neglects the crucial fact that Carter, although on formal leave of absence from the Muscle Shoals school system, was nevertheless relegated outside the normal processes and responsibilities of the system. Head Start, although apparently administered by the local board, is a federal program for children of low-income families. Charles Carter was told, in effect, that he could no longer be a driver in Alabama's normal educational system, but that he was welcome to a higher-paying position at the back of the educational bus. He taught exclusively the children of low-income families, symbolically, if not significantly, in the same building that once housed his former all-black school. It is clear to us that Carter was demoted within the purview of *Singleton* in the sense that he was placed altogether outside the normal functioning of the Muscle Shoals school system.

 More important, the board's argument that Carter was not demoted ignores the essence of school administration, of teaching, and of *Singleton* and its predecessors. Salary is not the only apogee in our hierarchy of values, and a truly dedicated educator, presumably the sort of educator that school boards would seek, will often minimize his monetary returns in exchange for factors that are more treasured by him as an administrator or teacher. The real gist of demotion is a reduction in responsibility, not in salary. Carter declaimed this to the Muscle Shoals school board, while *Singleton* wrote it into law. This principle of responsibility in the educational processes is at the heart of the entire desegregation process, as evinced when the Supreme Court first declared:

> "To separate them [the nation's black children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone."

Brown v. Board of Education of Topeka (Brown I), 1954, 347 U.S. 483, 494, 74

make any of Carter's testimony inadmissible. See 7 Ala.Code Ann. § 433. It also appears to us that a school board should have in its possession some records regarding positions available at particular times or positions offered and rejected. The board did not seem at any loss to explain in some detail its hirings and firings with regard to the other openings within the system between 1967 and 1970. In a situation where there is a considerable history of segregation in the educational processes, the school board has the burden of explaining its procedures regarding the employment of faculty and staff. See United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836, cert. denied, Caddo Parish School Board v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103; Williams v. Kimbrough, W.D.La.1969, 295 F.Supp. 578, aff'd on other grounds, 5 Cir. 1969, 415 F.2d 874, cert. denied, 1970, 396 U.S. 1061, 90 S.Ct. 753, 24 L.Ed.2d 755.

S.Ct. 686, 691, 98 L.Ed. 873, 880. We find it impossible not to conclude that the same feeling of inferiority inevitably results among the students when the leaders of the educational processes—the principals, the teachers, and administrators—are likewise separated from principals, administrators, teachers, and students of other races. *See* Dowell v. School Board of Oklahoma City, W.D. Okl.1963, 219 F.Supp. 427; Lee v. Macon County Board of Education, aff'd sub nom. Wallace v. United States, 1967, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422; Alabama League for the Advancement of Education, THE SLOW DEATH OF THE BLACK EDUCATOR IN ALABAMA (July 1971); Lieberman, Teachers and the Fourteenth Amendment—The Role of the Faculty in the Desegregation Process, 46 N.C.L.Rev. 313 (1968). The entire rationale of desegregation would be seriously if not fatally undermined if faculties and principalships remained segregated even in fully-integrated classrooms. Of course, an individual principal or teacher may decide otherwise for himself, and may reject a more responsible or equally responsible position for a newly offered position with a higher salary. However, a school board itself cannot prostitute the responsibility principle simply by offering higher salaries for substantially less responsible work to demoted employees. Charles Carter's intentions were clear. He chose responsibility over reimbursement, and the law certainly cannot fault him for that choice.

■ Having concluded that Carter was clearly demoted, we also conclude that he falls within the protective ambit of *Singleton's* provisions regarding reinstatement. At the time of Carter's demotion there was, to draw a mathematical analogy, a distinct "population" of principals in Muscle Shoals. Under *Singleton's* approach to the Fourteenth Amendment and under the particular facts of this case, any future principalship vacancy in the four Muscle Shoals schools *must* be filled from the ranks of that pre-desegregation order population.

The school board cannot go outside the population to appoint future principals of another race, color, or national origin, even if it stays within its own school system, until that population is exhausted or until the members of the population voluntarily opt out, or unless a member of the population is unqualified to serve.

■ It is presumed by this court that the school board of Muscle Shoals did not choose an unqualified man as principal of one of its schools and retain him as principal for a period of eight years. A similar presumption was made generically by this court in *Singleton.* It is not enough to assert that a principal hired from without the pre-order population is "more" qualified than a member of the population of demoted principals or teachers, for acceptance of that assertion would make illusory the constitutional presumption that this court erected in *Singleton.* The per se presumption of Singleton with regard to qualifications was erected to assure compliance with the Fourteenth Amendment in all phases of the desegregation process. In order to establish that a former principal was not "qualified," and therefore not within the protective penumbra of *Singleton,* a school board would have to establish the principal's lack of "qualification" by means of objective and absolute criteria, not by means of comparison with another applicant or by means of administrative institution. The board must show the former principal to be independently unqualified to assume the new opening. And in order to fulfill that burden the board would have to establish quite clearly why one who was qualified prior to a desegregation order suddenly became unqualified after the order.

In attempting to fulfill this burden and to question the qualifications of Charles Carter, the board does concentrate on the phrase "who is qualified" in the *Singleton* opinion, but its argument is merely a misunderstanding of the *Singleton* holding and rationale. The board argues that this court in *Singleton* ". . . did not intend to infer

that 'qualified' be limited to the simple and narrow construction of one who has met the requirements by law to be certified as a principal." Without passing on the board's inference regarding the adequacy of Alabama's qualification statutes for teachers and principals,[7] we simply note that the school board's statement of the issue is a misstatement of the issue in *Singleton* and of the issue in this case. *Singleton* obviously does not protect every Alabama citizen who might conceivably be qualified for a principalship under the Alabama statutes. *Singleton* addresses itself only to those Alabama citizens who held principalships prior to a desegregation order and whose qualifications have not deteriorated in an absolute and objective sense since the issuance of the order and the resulting demotion or dismissal.

With regard to Carter's own qualifications, the school board did not delineate in what ways Carter was "unqualified" or even "less qualified" for a principalship than the white vice-principal who was promoted over him, nor did the district court require such delineation. The school board asks us in its brief:

". . . [O]r is the term 'qualified' [in *Singleton*] intended by the Court to mean, in addition to certification [under the Alabama statutes, *supra* note 6] other pertinent qualifications such as performance, success, morality, ability to cope with problems, experience, accomplishment, ability to lead, to supervise, and to motivate?"

Without passing on the adequacy of this ad hoc checklist under the mandate of *Singleton,* we note that at no point in its brief or in the hearings before the district court did the school board ever question any of the above factors with regard to Carter. In fact, the board states early in its brief that ". . . no attempt was made to discredit Mr. Carter." We also note that, pursuant to the district court's order after Carter's petition for relief was denied, the school board filed objective and non-racial criteria for demotion, dismissal, employment, and transfer of its principals and teachers, as required by this court in *Singleton.* The criteria submitted by the school board regarding principals includes the following:

"A. Degree or degrees held.

B. Number of years of experience:

 1. As a principal in this system.

 2. As a principal in any system.

 3. In education other than as principal."

In terms of each of these criteria, as ranked by the board, Carter is not only eminently qualified for a principalship, but also comparatively more qualified than the white vice-principal who was hired over him in 1971. Probably a more precise statement of the reason for Carter's continued demotion was made by the present superintendent of the Muscle Shoals school system when he was asked why Carter had been passed over for the assistant principalship of the Avalon Middle School in 1970 in favor of a white applicant:

"We felt at the time it was in the best interest not only of the school but in the best interest for Mr. Carter because of the small percentage ratio of negro [sic] students."

This statement, to our mind, really let the cat out of the *Singleton* bag.

It is clear to this court that under the *Singleton* approach to the Fourteenth Amendment, if a principal is demoted or dismissed pursuant to a desegregation order and if his objective qualifications for his principalship do not diminish in an absolute sense after the issuance of the order and his demotion or dismissal, then he *must* be given opportunity to assume any new principalships or any positions tantamount to his lost principalship prior to the offering of the position to new applicants of another race. Our reading of *Singleton* is not new to the Alabama school systems. One of the episodes in the continuing saga of Lee v. Macon County Board of Education,

---

7. *See* 52 Ala.Code Ann. §§ 324, 329, 337.

involving the Limestone County School System, resulted in the following district court ruling:

> "[T]he Board was not free to recruit a new man to fill such a position until it had first offered the job to those . . . principals being demoted. . . . Such persons could be by-passed only if they were not 'qualified' for the position—not if they were merely 'less qualified.' "

Lee v. Macon County, N.D.Ala.1970, 321 F.Supp. 1, 4 n. 4.[8]

■ Charles Carter was passed over for the principalship of Avalon Middle School in violation of *Singleton* and of Carter's right to the equal protection of the laws. Although the Muscle Shoals school board was not a direct party-defendant in the *Singleton* case, and therefore not directly within its injunctive ambit, *Singleton* speaks generically, not only to the defendants specifically enjoined in that seminal case. Muscle Shoals' refusal to reinstate Carter as principal of Avalon Middle School, the basis of Carter's equitable claim, took place some eighteen months after *Singleton* had become law. The school board in its brief is clear that *Singleton* controls the outcome and the relief of this case insofar as the case deals with the board's 1971 actions regarding the principalship at Avalon, even though the board urges an interpretation of *Singleton* that differs substantially from ours. The board's violation of *Singleton* was substantive, and Carter is entitled to the principalship of Avalon or to the principalship of another school in the Muscle Shoals system.[9] The fact that the school board has already hired another to fill that vacancy obviously cannot prevent appropriate relief by a court of equity in vindication of the law and the Constitution. This is particularly true in Carter's case, in light of the fact that the school board signed its contract with the new white principal of Avalon months after the National Education Association had filed its motion for further relief in Carter's behalf. However, on remand, the district court should take such action as it feels appropriate to fulfill the contractual obligations of the school system to any principal whom Carter might replace.

A somewhat different question arises when we confront the issue of Carter's damages, in the form of back pay and back retirement benefits. It is not clear to us whether Carter is requesting damages only for the incidents of discriminatory refusal to reinstate him subsequent to *Singleton*, primarily the Avalon principalship in 1971, or whether he is also requesting back pay and retirement benefits that he might have lost as a result of the board's refusals to reinstate him to principalships in 1969 and 1970, or to other positions commensurate to his old position as principal throughout the 1967 to 1971 period. The question arises as to whether or not *Singleton* applies retroactively to violations of the precise *Singleton* mandate that occurred prior to the actual decision of that case in 1970. The question is relevant here only as it relates to Carter's damages; his claim for equitable relief is clearly governed by *Singleton*, applied prospectively.

While the rationale and thrust of *Singleton* is substantive, in the sense that it propounds the law as it substantively existed prior to 1970, there is also a substantial procedural element to the

---

8. Other circuits confronting similar issues have held that teachers who are demoted or dismissed pursuant to desegregation orders are not to be treated as "new" applicants for any vacancies that arise after the desegregation order. See Chambers v. Hendersonville City Board of Education, 4 Cir. 1966, 364 F.2d 189; North Carolina Teacher's Association v. Asheboro City Board of Education, 4 Cir.

1968, 393 F.2d 736; Rolfe v. County Board of Education, 6 Cir. 1968, 391 F.2d 77.

9. Carter's petition for relief requests an administrative principalship in the alternative to the Avalon principalship. Should the school board offer a position other than the principalship of Avalon, Carter, of course, is free to accept it.

actual holding of *Singleton* that is not amenable to retroactive application. *Singleton* held that any hiring of principals or teachers of another race from outside the pre-desegregation order populations of principals and teachers was a per se violation of the constitutional rights · of those principals or teachers who were within the pre-desegregation order populations. The only way that a school board could pass over a member of the pre-order population would be to take that member out of the protective penumbra of *Singleton* altogether by establishing that the principal or teacher was not "demoted" or "dismissed," or that the principal or teacher was not "qualified," factors which we have already discussed in greater detail. The specific per se cast of *Singleton* is more procedural than substantive in its protection of the Fourteenth Amendment rights of principals and teachers affected by desegregation orders, even though the substantive thrust of *Singleton* is clearly an exposition of pre-*Singleton* law. *Singleton's* novelty is procedural in the very sense of that per se pitch, for, if the facts of a case fall within the ambit of *Singleton*, the board is given no authority to explain its failure to reinstate. *Compare* the treatment of retroactivity regarding Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694, in Johnson v. New Jersey, 1966, 384 U.S. 719, 86 S.Ct. 1772, 16 L. Ed.2d 882, *with* the retroactivity issue in Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799. We emphasize that ". . . the choice between retroactivity and nonretroactivity in no way turns on the value of the constitutional guarantee involved. . . . [W]e do not disparage a constitutional guarantee in any manner by declining to apply it retroactively." Johnson v. New Jersey, *supra*, 384 U.S. at 728, 86 S.Ct. at 1778. But we must take cognizance of the fact that some school districts could conceivably have passed over demoted or dismissed applicants of one race in order to hire applicants of another race whom the board, in good faith and without

racial discrimination, considered "more qualified" than the earlier principals or teachers. That possibility is ". . . an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration." Chicot County Drainage District v. Baxter State Bank, 1940, 308 U.S. 371, 374, 60 S.Ct. 317, 319, 84 L.Ed. 329, 331.

■ Carter may still recover damages, in the form of lost pay and lost retirement benefits, for events that transpired between 1967 and 1971, but he cannot base his claim *solely* on the *per se aspect* of *Singleton*. Pre-*Singleton* law does provide "other safeguards" to protect the Fourteenth Amendment rights of demoted or dismissed principals. Johnson v. New Jersey, *supra*, 384 U.S. at 729, 86 S.Ct. 1772; *see also* Griffin v. California, 1965, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. Where the educational processes had historically been segregated, the pre-*Singleton* law of this court cast the burden onto the school board to prove that its hiring practices were non-discriminatory:

"As to faculty, we have found that school authorities have an affirmative duty to break up the historical pattern of segregated faculties, the hall-mark of the dual system. . . . *The school authorities bear the burden of justifying an apparent lack of progress.*"

United States v. Jefferson County Board of Education, 5 Cir.1966, 372 F.2d 836, 895 [emphasis added], aff'd en banc, 5 Cir.1967, 380 F.2d 385, cert. denied, Caddo Parish School Board v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103. *Accord,* Chambers v. Hendersonville City Board of Education, 4 Cir.1966, 364 F.2d 189; Rolfe v. County Board of Education, 6 Cir.1968, 391 F.2d 77; *see also* Brown v. Board of Education of Topeka (Brown II), 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. While that burden is itself a presumption cast against the school boards in the realm of the Fourteenth Amendment and

racial discrimination within the educational processes, the *Jefferson* presumption simply does not reach the per se level of the *Singleton* presumption, even though the burden remains on the school board. In addition, *Singleton* mandates that the objective and non-racial criteria that are to be used for demotion, dismissal, or transfer of principals, teachers, or administrators—criteria required substantively by *Jefferson* and its predecessors—must be written and retained for public inspection. That *Singleton* mandate is not in issue in this case.

■ The Muscle Shoals school system remained dual until 1967, and there is testimony in the record by the present superintendent that gives clear and affirmative support to the proposition that the school board's decisions from 1967 to 1971 were racially motivated. Since Carter was passed over not only for three principalships but also for other positions for which he was qualified between 1967 and 1971, and without any written objective criteria as required after 1970, it is clear that the Muscle Shoals school board has the burden of establishing that its refusal to reinstate Charles Carter was not racially motivated during those years. Of course, we leave to the district judge on remand the question of the precise amount of back pay and back retirement benefits due, and any attendant findings of fact that might be required.

It is the order of this court that Charles Carter be immediately reinstated as principal of the Avalon Middle School or of another school in the Muscle Shoals system. In addition, Carter is entitled to any back pay and to the reinstatement of any retirement benefits that were lost as a result of the board's discriminatory refusal to reinstate him to a position tantamount to that from which he was demoted in 1967. *See* Singleton v. Jackson School District, *supra*; United States v. Jefferson County Board of Education, *supra*; see Rauls v. Baker County, Georgia, Board of Education, 5 Cir.1971, 445 F.2d 825, for a similar order.

■ With regard to Carter's requests for back pay and retirement benefits relating back to principalships denied him in 1969 and 1970, the *Jefferson* standard would apply as we have already explained in detail. Under *Jefferson* the school board's administrative intuition is not enough to satisfy the burden that it must carry in situations in which the facts show both a history of racial separation in the area of administrative or faculty positions and a clear and continuing failure to remedy the situation. Thus far, the board has offered into evidence no objective criteria that were allegedly used in its hirings, firings, and transfers, until it submitted objective criteria for *future* administrative procedures in response to the lower court's specific order in the instant litigation to comply with *Singleton, supra,* note 4. More important, the board has offered no reason whatsoever for its failures to reinstate Charles Carter to principalships in 1969 and 1970 while hiring over him white applicants. However, the case was not tried below on a *Jefferson* standard, and the school board may have other evidence to present. Therefore, on remand, the district court should determine the question of Carter's damages, in the form of lost back pay and retirement benefits, that allegedly occurred between 1967 and 1970 under the *Jefferson* criterion. If the district court is not satisfied after its examinations on remand that the school board has overcome the *Jefferson* presumption to justify its actions during that period of time, then Carter would be entitled to recover the differences in salary and retirement benefits, if any, between what he earned as Head Start teacher and later as physical education instructor and the salaries that he would have received had he been reinstated to principalships in accordance with the constitutional standards explained in *Jefferson*. Those differences in salary

and retirement benefits, if any, should be computed from the dates on which Carter would have assumed each principalship had there not been racial discrimination in the educational hiring and reinstatement processes.

 With regard to Carter's request for back pay and retirement benefits relating back only to the denial of the Avalon principalship in May of 1971, the *Singleton* per se standard would apply, and Carter would clearly be entitled to the difference, if any, between his salary as physical education instructor and the salary that he would have received as principal of Avalon, computed from the date on which he would have assumed that principalship had there not been racial discrimination in the hiring and reinstatement processes.

It is regrettable that the nation's constitutional journey toward equal protection of the laws for all Americans in the area of education must often run a course through the private and professional lives of individual students, teachers, and administrators. The undisputed testimony in this record is that during a four year period Charles Carter was not offered a smidgeon of a position within the Muscle Shoals school system. He was relegated out of the school system in defiance of *Singleton's* teachings, and finally in violation of *Singleton's* letter. We realize that there are shoals to be crossed in the treatment of faculty while desegregation proceeds, but the black teacher must not be the only one to be stranded while positions are filled by whites from afar. Because Muscle Shoals failed to comply with the laws and the Constitution with regard to activities and employments closely associated with the desegregation of the educational processes, the case of Charles Carter is reversed in part and remanded for immediate reinstatement, back pay, back retirement benefits, and such other relief and proceeding as the district judge may require.

Reversed in part and remanded with directions.