Vira **CELESTAIN** et al.

v.

**VERMILION PARISH SCHOOL
BOARD** et al.

Civ. A. No. 11908.

United States District Court,
W. D. Louisiana,
Lafayette Division.

June 26, 1972.

Margrett Ford, New York City, for plaintiffs.

Harry J. Kron, Jr., Thibodeaux, La., for defendants.

Gerald F. Kaminski, and Joseph D. Rich, Education Section, Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., amicus curiae.

## FINDINGS AND CONCLUSIONS

PUTNAM, District Judge.

This rule was brought by the United States by and through the Office of Attorney General, Department of Justice, in behalf of Mr. Ned Robinson, a Negro member of the teaching staff at Gueydan High School, seeking his appointment as an Elementary School Principal within the Vermilion Parish public school system. Defendants are the School Board, its individual members, and the Superintendent of Schools. Back pay for Mr. Robinson is also an issue.

We find the facts as follows:

1. Mr. Ned Robinson was employed by the Board in 1954 as teaching principal at a small Negro elementary school in the town of Gueydan, which lies in the extreme western portion of Vermilion Parish. He continued in this position until the school, Jesse Owens Ele-

mentary, was closed at the end of the 1966–67 school year.

2. Jesse Owens Elementary School served walk-in pupils only. In 1966–67 the student body consisted of 57 pupils and the faculty consisted of three teachers. Following closure of Jesse Owens, Mr. Robinson was transferred to the position of Teaching Principal at the Wilkins Stroud Elementary School, located in Kaplan, Louisiana, in the central portion of Vermilion Parish and some sixteen miles from Gueydan by road. At the end of the 1967–68 school year, this school, also a small all-black neighborhood school serving 136 pupils and utilizing five teachers, was closed.

3. The Mouton Cove Elementary School, an all-white institution with a small student body, faculty and Teaching Principal, was closed at the end of the 1967–68 school year, and Perry's Bridge Elementary, another all-white school comparable in size, grade structure, and student body to the others was closed at the end of the 1967–68 school year.

4. The defendant Board was ordered to desegregate under a "freedom of choice" plan in 1966. In closing the four schools mentioned above the Board pursued a plan of consolidation of the schools in its system conceived and put into effect after the present Superintendent of Schools, Dr. Joseph Kite, was elected to that position in 1967. All of the Negro students then in the system were either absorbed into the existing or newly constructed schools in their respective communities, or allowed to attend Herod High School, located in Abbeville, if they chose to do so. In 1967, following the decision in United States v. Jefferson County Board, et al, 5th Cir., 1966, 372 F.2d 836, aff'd en banc 1967, 380 F.2d 385, cert. den., Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103, 1967, this court imposed the requirements of that decree upon the defendants pursuant to the mandate coming down to us, which again permitted "freedom of choice". The history of this suit may be obtained by reading

Conley v. Lake Charles School Board, et al, W.D.La.1968, 293 F.Supp. 84, reversed in Hall v. St. Helena Parish School Board, et al (consolidated appeals), 5th Cir. 1969, 417 F.2d 801, and Conley v. Lake Charles School Board, W:D.La.1969, 303 F.Supp. 394, and the opinion of this court in the instant case rendered on August 4, 1969, which was not reported. A copy of this opinion will be attached to these findings and conclusions for reference. No appeal was ever taken from this decree. As a matter of historical fact, therefore, Mr. Robinson's previous position of Teaching Principal did not become vacant as a direct result of any desegregation orders or decrees entered by the court.

5. Closure of Jesse Owens, Wilkins Stroud, Perry's Bridge and Mouton Cove Elementary Schools was inevitable and necessary to an economical administration of the school system, and would have occurred even though the original decree of 1966 had never been entered. We do not imply or suggest that other all-black schools might not have been built by the Board in the absence of the pending litigation. While closure of the schools was advanced as a reason for adoption of the parish desegregation plan in 1969 in preference to the plan submitted by HEW, the deciding factor as reflected in this court's opinion was the affirmative attitude of the Board and the admitted fact that its proposed plan was in the best interest of the system and the educable children enrolled in its schools. (See also transcript of pretrial conference held in August, 1969, in this record).

6. Mr. Robinson holds a bachelor's degree, a master's degree, and has completed 35 hours toward his doctorate from accredited educational institutions. At closure of Wilkins Stroud Elementary he was retained in the school system as a teacher of mathematics and science at the Gueydan High School, which he retains at this date. In addition to his regular teacher's salary, the Board has continued to implement his pay with the principal's supplement of $1050.00 and his total salary at present is $11,400.00 per annum.

7. Mr. Robinson first indicated to the Superintendent that he was interested in a job within the system commensurate with his previous employment by letter dated May 11, 1968, and successively thereafter when various principalships were open and came to his attention through May 14, 1972. His current application is for the position of Supervising Principal if a grade five through six, or other elementary school, is opened during the 1972–73 term at the former Herod School facilities in Abbeville. This school would serve approximately 600 pupils and utilize 27 teachers of both races, and is located approximately thirty miles from his residence. At the hearing he stated that he would also be interested in the principalship vacancies presently existing at the Seventh Ward Elementary School, 243 pupils, 9 teachers, grades 1–8, and E. Broussard High School, 309 pupils, 16 teachers, grades 1–12.

8. The first principalship filled by the Board after the decision in Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 419 F.2d 1211, was handed down, was at Pecan Island High School, 110 pupils, eight teachers, grades 1–12. This position is a Supervising Principalship. The only remaining school employing a Teaching Principal in the system today is Forked Island Elementary, 130 pupils, 6 teachers, grades 1–6, in which no vacancy has occurred since prior to the year 1966. The Pecan Island principalship was not offered to Mr. Robinson.

9. In October, 1971, this court ordered that our decree of 1969 be amended to include the Singleton, supra, requirements as to faculty and staff, and the reporting requirements of United States v. Hinds County, 5 Cir. 1970, 433 F.2d 611, and this was done on November 17, 1971. However, on October 8, 1970, the Board was made aware of the Singleton requirements and ordered to adopt objective criteria to be applied in the event of any reduction of staff or

faculty at any school in the system which resulted in the discharge or demotion of any person employed therein as a result of the desegregation process. Sometime thereafter the Board did adopt such criteria, a copy of which is in the record as Exhibit D–1. According to Exhibit D–2, Mr. Robinson's qualifications based upon the Board's criteria were superior to those of two of the five principalships filled by the Board since the effective date of *Singleton* on October 10, 1969. See also U.S. Exhibit 10.

10. The responsibilities of Teaching Principal at Jesse Owens and Wilkins-Stroud Elementary schools required him to teach two classes full-time and to supervise teachers, extra-curricular activities, one lunch room employee and one janitorial employee, together with other general duties of discipline of students, parental consultation and parent-teacher relations in the community. These supervisory and administrative responsibilities occupied approximately fifteen per cent of his time.

11. Expert testimony elicited in the case by the Court from Dr. Louis Coussan, Dean of the College of Education, University of Southwestern Louisiana, Lafayette, Louisiana, who was called to the stand at the request of the Court and whose qualifications were agreed to by all parties, established that: (a) in present day school systems the Teaching Principal has been eliminated except in some few remaining rural schools, (b) the responsibilities of a Teaching Principal at schools of the size and grade structure of Jesse Owens and Wilkins Stroud are greater than those imposed upon faculty members engaged in teaching only, such as the position Mr. Robinson now holds, (c) Mr. Robinson's qualifications viewed objectively qualify him for the principalship of any school in public school systems of this area, even as a Supervising Principal, and (d) the job status of Teaching Principal formerly held by him at the time of closure of Wilkins Stroud is tantamount or equal to the job status of Teaching Principal

at any elementary or high school, and also as an active, administrative, working position as Assistant Principal at any large high or elementary school in school systems in this area, from a standpoint of *responsibility* and (e) his objective qualifications fit him for any supervisory or administrative positions on the Central Staff or in Federal Programs administered by school systems in this area. We so find. The duties and responsibilities of Supervising Principals, Teaching Principals, and Federal Programs Supervisors as well as Assistant Principals, are set forth more particularly in Joint Exhibit 1, taken from the guidelines employed by the Vermilion Parish School Board, supplemented by the testimony of Dr. Kite, Dean Coussan and Mr. Robinson at this hearing.

12. We further find from considering all of the evidence in this case that appointment as Supervising Principal to any school in the Vermilion Parish School System or to the Central Staff or the Director of Federal Programs' staff in a supervisory capacity would be a promotion over the positions held by Mr. Robinson due to the fact that there is a substantial difference in responsibility attached to these positions in all aspects of supervision and administration. This conclusion is based upon a down-to-earth assessment of the realities of the duties imposed upon educators at these levels in actual practice, as developed by the evidence in the case.

13. Dr. Kite, in making his recommendations for appointment of principals and assistant principals to the defendant Board, exercised his own individual best judgment in considering the ability of the applicants to relate to the community in which the school was located, to establish good public relations, faculty relationships, and principal-parent relations in disciplinary matters, to the best interest of the school and of education in his school system. He considered the application of Mr. Robinson along with all other applications before him on the basis of the objec-

tive criteria developed by the Board in the appointments made since October 10, 1969, for each position to which Mr. Robinson had made application. He did not know that the *Singleton* criteria applied to appointments to new vacancies, but was under the impression that it applied only to discharged faculty and staff following in the wake of the unitization of the public schools under his supervision. Further, he had been advised that because closure of the schools to which this employee had been assigned resulted from the voluntary acts of the Board while under "freedom of choice" decrees and prior to *Singleton,* he would not fall within the categories included in that decree.

14. There were five Negro school principals in the Vermilion Parish School System when our first decree was entered in 1966. They, with two other white Teaching Principals, were displaced as the result of school closures outlined above. Two of the Negro principals have retired, two have accepted staff positions and Mr. Robinson with the two white principals were absorbed into the faculties as teachers at other schools in the system.

. 15. On April 21, 1972, Dr. Kite wrote to Mr. Robinson and offered him the position of Supervisor of Adult Education in the school system, directly under the Director of Federal Programs, with general supervision over all of the teachers and other employees in this work. This same position was occupied by Dr. Kite prior to his election as Superintendent. He resigned as a teacher and coach of Kaplan High School to take the appointment. The position now pays $13,600 per year. This offer was declined. U.S. Exhibits 7 and 8. During the trial of this motion the offer was again tendered to Mr. Robinson, and, in addition, defendants tendered to him appointment as Supervising Principal at Pecan Island High School, this being the first vacancy occurring after the Singleton requirements became effective. Both positions were declined. Mr. Robinson stated that he would accept ap-

pointment as principal at E. Broussard, Herod Elementary if reopened, and Seventh Ward Elementary, but these were not offered to him. No firm offer of appointment as Assistant Principal at any of the system's high schools or larger elementary schools has been made. It is established further that his employment as Supervising Principal at any school to which he might commute from Gueydan on a daily mileage basis of from 25 to 35 miles one way would keep him away from his home and family as long or longer than would his employment as Supervisor of Adult Education, because the Principal is required to attend sports events, school plays, PTA meetings and like events, as well as to remain at the school until the last school bus leaves the premises.

## OPINION AND CONCLUSIONS

Assuming the position most favorable to the Government, that Mr. Robinson was demoted as a result of the desegregation process in 1968 with closure of Wilkins-Stroud School, within the meaning of *Singleton,* supra, we next approach the question of his rights within the school system to future job openings under the rule of that case and subsequent decisions controlling in this Circuit.,

In that case the Fifth Circuit Court of Appeals, in what was then an obviously necessary step to prevent the dismissal of many black . . . "principals, teachers, teacher-aides and other staff who work directly with children . . ." as the result of desegregation in other school districts, required all Boards to develop objective criteria to be used in ". . . selecting the staff member who is to be dismissed or demoted . . .", and defined the term "Demotion" as follows:

"'Demotion' as used above includes any reassignment (1) under which the staff member receives less pay or has *less responsibility* than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held pre-

viously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had *substantial* experience within a reasonably current period. *In general and depending upon the subject matter involved, five years is such a reasonable period."* (Emphasis supplied)

It further clearly stated the rule that:

"In addition if there is any such dismissal or demotion, no staff *vacancy* may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill *the vacancy* and has failed to accept an offer to do so." (Emphasis supplied)

This School Board escaped the confusion following upon the decisions of the United States Supreme Court in Alexander v. Holmes County, 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, and Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L. Ed.2d 477, which reversed the *Singleton* decision in part, but which preserved the protective clauses quoted above for the benefit of dismissed or demoted faculty members. The Vermilion Board found itself in this position because of two factors not unrelated to this hearing: (1) there was no appeal taken from our decree of 1969 approving the Board's plan in consequence of which *Singleton,* supra, was not incorporated into the original decree, and (2) full integration of the student body was achieved at the beginning of the 1970–71 school session *by closure of the Herod School at Abbeville, which had been kept open to allow Negro students to exercise their choice of attending a school with a majority Negro student body.*

After our order of September 18, 1970, entered en banc, objective criteria were developed by the Board. The sufficiency of these criteria is not for decision at this time and nothing in this opinion shall be construed as an unqualified approval of their form and content. They do, however, compare favorably with the criteria approved in the case of United States v. Texas Education Agency et al., 5 Cir., 1972, 459 F.2d 600, attached to that decision as appendices. On the basis of these criteria, Mr. Robinson would have qualified for the position of Supervising Principal at Pecan Island High School. There is no showing that he knew of the existence of such criteria, or that he knew of the vacancy at that school. He testified that he did not know of it at the time, and we accept this as true.

More recently the cases of Lee v. Macon County Board of Education, 5 Cir. 1971, 453 F.2d 1104, and Lee v. Macon County Board of Education, 5 Cir. 1972, 456 F.2d 1371, have interpreted the *Singleton* requirements to mean that the objective criteria to be applied to staff members dismissed or demoted as a result of integration, must also be applied to determine whether or not any such dismissed or demoted staff members must be appointed to any vacancy equal to his former position, thereafter arising in the system. Subjective evaluations by the Superintendent or Board or any other school official charged with the responsibility of filling vacancies such as were employed by Dr. Kite in this case, are referred to in the *Lee* decisions as "administrative intuition", and may not be considered.

Such "administrative intuition" is universally practiced in the business world when executive or administratively important positions are to be filled, and it will doubtless be difficult for the layman, or even members of the faculty and staff in the public school systems, to understand why they are not equally valid and important in deciding which ". . . principals, teachers, teacher-aides and other staff who work directly with children . . ." are to be promoted in the public school systems. But, in order to insure that discrimination on account of race, color, national origin, religion or any other ground, is

not practiced against displaced personnel, the Court stated the law to be:

"In *Singleton,* this Court granted a limited preferential right to promotion, in the event of subsequent vacancies, to members of the pre-desegregation order school staff population who were dismissed, demoted, or displaced in the wake of school desegregation. (Citation omitted.) The essence of the *Singleton* approach as a protection of the Fourteenth Amendment rights of those displaced is this: if a school official, administrator, teacher, principal, or coach is demoted or dismissed as a result of a desegregation order, and if his objective qualifications for his former position do not diminish in an absolute sense after the issuance of the order and his displacement, *then he must be given the opportunity to assume any new position equal to the one he lost, prior to the offering of the position to any new applicants.* This is the *per se* presumption of *Singleton* underlined in our recent decision in Lee v. Macon County Bd. of Educ., 5 Cir. 1971, 453 F.2d 1104 [1971] in which we reviewed a similar situation of 'faculty fallout'" (456 F. 2d at 1373. Emphasis supplied.)

■ But we do not read *Singleton* or either of the *Lee* cases as requiring the Board to offer to such staff or faculty member an unlimited choice of *any and all* vacancies that might occur after his dismissal or demotion. In *Singleton,* as we have emphasized above, the court speaks of *a* vacancy—the word is used in the singular. Once a position equal to the one previously held has been offered, the faculty member in question may either accept it or voluntarily reject it. Such a tender, in our opinion, fulfills the obligation of the Board to the faculty member and dispenses it from offering all future vacancies of a like position to him. His option is absolute, but if he does not exercise it when tendered, he "opt[s] out", 453 F.2d at 1110.

■ The Court went further, and emphasized that the responsibilities attendant upon the former position are a paramount consideration when applying the definition of "demotion" in *Singleton* to filling new vacancies, and that the equal pay requirement is subordinate thereto.

■ In this case, following these principles as we are bound to do, the evidence is abundantly clear that although Mr. Robinson in his present capacity as math and biology teacher at Gueydan High School draws the same pay he would draw as a Teaching Principal, his responsibilities have been diminished. We conclude that he is within the *Singleton* definition of a demoted member of the faculty, *predicated upon our primary assumption that his demotion was the result of desegregation.*

We further conclude that it was, and is, the Board's obligation under *Singleton* and *Lee* decisions, supra, to offer him the first vacancy tantamount or equal to his previous employment. The evidence in this case shows that there is only one Teaching Principalship remaining in the system and that it has not become vacant. But the evidence further shows that the Pecan Island High School principalship was the first vacancy occurring after Singleton that was filled by a person of a race other than that of Mr. Robinson, most nearly equal to his former position in the system. Also, according to the Vermilion Parish School Board's own objective criteria, his qualifications fully meet the requirements of the job. See Exhibit D–2. The Board has voluntarily offered this appointment to him. Moreover, over and above this, they have offered him a position of first importance in the Adult Education Program of this system. He is fully qualified for this position as well. He has declined these offers.

■ Under these circumstances, we hold that the defendants Vermilion Parish School Board, its individual members, and Superintendent of Schools have discharged their obligations under the *per se* preferential rule announced in the *Lee* cases, supra, to Mr. Robinson, and cannot now be faulted.

The foregoing conclusion is, as noted at the outset, premised on the assumption that Mr. Robinson's demotion was a result of the desegregation of this school system. The schools of which he was Teaching Principal were closed one to two years before *Singleton,* and two to three years before *Alexander* and *Carter,* supra. Included in the displaced faculties existing before these decisions were announced, were a comparable number of white faculty and staff members. As noted in our findings of fact, these small all-black schools were closed along with two small all-white schools, at or about the same time. While the burden resting upon the School Board to show either that the demotion of a teacher was (1) not the result of the desegregation process, or (2) that the teacher in question is not qualified, in order to "take that member out of the protective penumbra of *Singleton" Lee,* supra, 453 F.2d at 1113, we conclude that this burden has been met in this case.

The testimony of Dr. Kite is clear and uncontradicted. It is supported by a total lack of evidence that any of the demoted white faculty and staff have been placed in the school system or treated differently from any demoted black faculty or staff member. In fact, the record affirmatively shows otherwise, as Dr. Kite testified that the former white Teaching Principals have accepted faculty position within the system. They also are within the "protective penumbra" of *Singleton,* and deserve equal attention by the Government in this case, acting as amicus curiae.

We hold that the only school in the Vermilion Parish Public School System closed as a direct result of the command of Brown v. Board of Education, 1959, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, to desegregate with "all deliberate speed", culminating with the mandate of *Carter,* supra, to integrate instanter, was Herod High School in Abbeville. Further, it is extremely unlikely that the defendant board in this case would have, even in the absence of any deseg-regation order issued by this court, constructed any all-black schools to replace Jesse Owens, Wilkins Stroud or Dozier High School in Erath under HEW regulations, having so successfully completed the consolidation of these schools with others in the system while under no compulsion to do so. See our attached opinion dated August 4, 1969.

█ If this record is studied as a whole from the inception of this suit through the present date, the court believes that our conclusion that Herod was the only school closed as a result of the desegregation process in Vermilion Parish, and that its faculty and staff are the only displaced or demoted members of the school system's professional population, is unquestionably correct. Mr. Robinson, and the other members of the professional family whose positions were changed when the Jesse Owens, Wilkins Stroud, Dozier, Perry Elementary and Mouton Cove Elementary schools were closed, do not fall within the category of persons encompassed in *Singleton's* provisions. For this reason alone, the motion must be denied. *Lee,* supra.

This is not to say that Mr. Robinson and all others in the school system in his category are barred from advancement in their professional fields. On the contrary, he can and should apply for any vacancies that occur, and his present application for appointment to the principalship at the Herod Elementary School, if it is created this fall, should be considered and acted upon fairly, objectively, and without discrimination along with all other applications for this position.

We would add this caveat, however, for the benefit of Mr. Robinson—and all others in the school population who might have been demoted—Singleton specifically limits the time within which the *per se* right to the offer of any vacancy equal to his former position applies, to a period of five years from the date he was demoted, which was at the closure of Wilkins Stroud at the end of the 1967-68 school year. See *Lee,* su-

pra, 453 F.2d at 1108. Armed with this knowledge, he may well wish to reconsider his rejection of the two offers made to him, and we will direct that the Board hold them open for a period of ten days following entry of our judgment within which he may notify the Superintendent of Schools that he wishes to accept one or the other of them.

We further direct that the Board hold the positions of principal at Herod, E. Broussard, and Seventh Ward Elementary Schools vacant, pending the appeal of our decision, or that, if the appeal is not decided before the appointments must be made for the 1972–73 school year, they be made with the specific understanding with the appointee that if this court is reversed their appointment will be subject to Mr. Robinson's rights as decided by the Court of Appeals.

Judgment has been rendered accordingly. Our decree accompanies these reasons.