Ira Mae **SPARKS** et al., Plaintiffs-Appellants,

v.

Merritt **GRIFFIN**, Individually, et al., Defendants-Appellees.

No. 71–2747.

United States Court of Appeals, Fifth Circuit.

May 16, 1972.

Rehearing Denied June 19, 1972.

John G. Abbott, Larry Watts, Houston, Tex., for plaintiffs-appellants.

Welby K. Parish, Wayne V. R. Smith, Gilmer, Tex., for defendants-appellees.

Before GEWIN, AINSWORTH and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Prior to 1965, the Union Hill Independent School District, located in Upshur County, Texas, operated a fully segregated public school system consisting of two campuses: the all-white Union Hill campus and the all-black Bethlehem campus. After the introduction of a freedom-of-choice desegregation plan in the 1965–1966 academic year, the district's schools were converted into a unitary pupil assignment system at the beginning of the 1968–1969 academic year with the abandonment of the Bethlehem campus and the assignment of all students, black and white, to the Union Hill campus.

On March 25, 1968, the district's board met for the purpose of renewing teacher contracts for the following school year. At that meeting the board voted not to renew the contracts of the plaintiffs-appellants in this case, Ira Mae Sparks and Tommy Bozeman, who are black, while voting to renew the contracts of all the other teachers in the system. Mrs. Sparks and Mr. Bozeman brought suit in the district court challenging the board's failure to renew their teaching contracts

for the 1968–1969 school year. Both plaintiffs asked the court to order their reinstatement and Mr. Bozeman requested an award of back pay from the end of the 1967–1968 school year to the date of the offer of a new contract. After a non-jury trial, the district court denied all relief to both plaintiffs and they have appealed. We reverse and remand for entry of judgment in favor of each plaintiff.

## THE FACTS

The Union Hill Independent School District is a small, rural system consisting of approximately 250 students, 15 teachers, a Superintendent, his secretary, and a maintenance man. From 1965 to 1969, the number of black faculty members declined from seven to three, while the total number of teachers remained constant.

With the anticipated closing of the Bethlehem campus for the 1968–1969 school year, it was expected that the district could lose one teaching position as a result of a decline in the average daily attendance (ADA). In addition, there was a possibility that federal funds for a remedial reading program would not be available for the 1968–1969 school year.

Mr. Bozeman began teaching at the Bethlehem campus in the 1957–1958 school year and continued to teach there until the end of the 1967–1968 year. Mrs. Sparks began teaching at the Bethlehem campus in the 1962–1963 academic year and was transferred to the Union Hill campus for the 1966–1967 year for the purpose of participating in a federally funded remedial reading program. She taught at the Union Hill campus two school years, or until the end of the 1967–1968 school year.

At the board meeting of March 25, 1968, Superintendent Merritt Griffin advised the board that the expected reduction in the ADA for the district necessitated the non-renewal of one teacher's contract. He recommended that Mr. Bozeman not be rehired, citing several alleged deficiencies in Mr. Bozeman's performance while employed by the district. Mr. Griffin also briefed the members of the board about certain alleged shortcomings in Mrs. Sparks' teaching performance but made no suggestions as to the renewal of her contract. As noted supra, however, her contract was not renewed. In the margin, we have reproduced letters dispatched by Mr. Griffin to an official of the United States Department of Health, Education, and Welfare explaining the reasons for the board's decisions not to renew the contracts of the two plaintiffs in this case.[1]

1. LESTER McCURRY     HARVEY GOOLSBY     DAN AICHLET
President of the Board     High School Principal     Secretary
*UNION HILL INDEPENDENT SCHOOL DISTRICT*
MERRITT GRIFFIN, SUPERINTENDENT
Box 929
BETTIE, TEXAS 75632

Phone 762–2755

June 7, 1968
Mr. Don Vernon
Room 3211
Rob. Building
Office of Civil Rights
7th D St. Southwest
Washington, D. C. 20202
TO WHOM IT MAY CONCERN:
I, Merritt Griffin, Superintendent of the Union Hill School will list some of the reasons why Mrs. Ira Mae Sparks' contract was not renewed for the 1968–69 school year.
Union Hill started a remedial reading program after receiving Title I funds. I felt that Mrs. Sparks would be better in that program than in other work in this school.
All expenses was (sic) provided for Mrs. Sparks to attend a Remedial Reading workshop in Austin, Texas, after all arrangements were made Mrs. Sparks did

not attend. The school did not find out untill (sic) after the workshop was held. Since Mrs. Sparks has been teaching in this program for the past two years, the children have ruined the machines, slides, and films. The class is poorly organized and Mrs. Sparks has no control over the group while teaching. Often Mrs. Sparks students are found visiting other classes, playing in the gym, and on two occasions have been found fighting. Seemingly, they go and come in her class as they wish.

Occasionally, I have passed through her room and have found the boys and girls more engaged in a (sic) little courtship groups than in reading.

Mrs. Sparks, has a language problem. She cannot help the negro dialect, but it is certainly bad for the children to be subjected to it all day.

Last year Mrs. Sparks made little effort to evaluate the reading program. I had to get other teachers in the system and the school secretary to work up an evaluation acceptable to the State Department.

In order to continue to have school at Union Hill, we must have a school that will be acceptable to both races, and if the Union Hill school cannot make improvements in its faculty and program its days are limited. Most of the schools have increased in white attendance the past two years. Below, I have listed what happened to Union Hill's ADA over the last three years.

1965–66 ADA 183

1966–67 ADA 161

1967–68 ADA 140

We have thirty white students to apply for transfer to Gilmer. We have know (sic). way of stopping transfers out of our school to Gilmer.

We have two negro teachers living in our school district, and one living in Gilmer. I try to tell these teachers that their jobs will be more secure by being able to improve our faculty and give a better school program to our people.

We have a Head Start Program in our community. We have two negro bus drivers, two negro teachers (sic) aides, and one negro teacher working in Head Start. We have seven negro youths and two white youths working in N.Y.C.

The School Board and I studied Mrs. Spark's problem. We feel that for the best interest of our children and community her contract should not be renewed. I feel like this complaint should not be considered as a major problem considering what we have done in integrating schools. I pray that the Union Hill School will be able to continue to solve its problems, and bring about a program that will be satisfactory to both races. We must have a program that will help prepare our boys and girls to live a life the best this country can offer.

Respectfully,
Merritt Griffin, Superintendent
Union Hill School
MG/rw

| LESTER McCURRY | HARVEY GOOLSBY | DAN AICHLET |
| President of the Board | High School Principal | Secretary. |

*UNION HILL INDEPENDENT SCHOOL DISTRICT*

MERRITT GRIFFIN, SUPERINTENDENT
Box 929
BETTIE, TEXAS 75632

Phone 762–2755

July 29, 1969
Mr. Don Vernon
Room 3211
Office of Civil Rights
7th Street, Southwest
Washington, D. C. 20202
Dear Sir:

You will find listed below some of the reasons Mr. Tommy Bozeman, was not hired for the 1968–69 school year.

The Union Hill School integrated the seventh through the twelfth grades from 1964–68. The Union Hill School offered freedom of choice in grades one through six. The three teachers at Bethlehem school had around fifty students in the first six grades. The teachers at Union Hill had around ninety in the first six grades, this created a very crowded situation in the Union Hill School.

The explanation was given to me that the people of Bethlehem school was not pleased with Mr. Bozeman's teaching.

On the morning of March 26, 1968, Mr. Griffin went to the Bethlehem campus where he informed Mr. Bozeman, outside his classroom, that his contract had not been renewed for the 1968–1969 school year because of a reduction in the ADA and for other reasons. Mr. Bozeman was advised that if he wanted to discuss the other reasons, or if he wanted a board hearing, he was to report to Mr. Griffin's office. That same morning Mr. Griffin went to Mrs. Sparks' classroom at the Union Hill campus, called her outside, and informed her that her contract had not been renewed for the 1968–1969 school year. She was told that if she wanted a hearing before the board or desired to discuss the reasons for the board's action, she was to report to the Superintendent's office.

Neither plaintiff requested a hearing before the board and neither plaintiff attempted to discuss the non-renewal of his or her contract with Mr. Griffin. Both plaintiffs continued to teach in the Union Hill Independent School District until the end of the 1967–1968 school year and both plaintiffs continued to draw salaries from the district until August 31, 1968.

On or about June 1, 1968, Mr. Bozeman reported to Mr. Griffin's office to make application for the withdrawal of his accumulated teacher retirement funds. Mr. Griffin advised him not to make the withdrawal. Mr. Bozeman responded by stating that he planned to retire permanently from the teaching profession. Mr. Griffin's secretary, Mrs. Ruth Wallace, then assisted Mr. Bozeman in completing the application for the withdrawal.

In August, 1968, one of the district's teachers, Mrs. Bugg, resigned from the faculty, thereby creating one opening for a teacher in the district. A white teacher was hired to fill that vacancy. That same month, August 1968, the federal government approved additional Title I funds for the district's remedial reading program. A white teacher was hired to conduct that program, a function previously performed by Mrs. Sparks.

Mrs. Sparks did not secure other employment for the 1968–1969 school year, but managed to obtain other employment for the 1969–1970 year. It appears that Mr. Bozeman was not successful in obtaining alternative teaching employment following the board's failure to renew his contract for the 1968–1969 academic year.

It is undisputed that prior to March 25, 1968, the district had not promulgated non-racial, objective criteria for the selection of teachers to be dismissed or demoted in connection with the desegregation of its schools.

Mr. Bozeman, was associated with a young negro man that created a disturbance (sic) at one of the Union Hill basketball games.
The Union Hill School has always stressed properly grooming amoung (sic) students.
Mr. Bozeman, wore a mustache and a goatee. I personally did not think this was a good example to set before the student body.
On one or more occasions, (sic) I refused to accept one young man from another school untill (sic) he shaved and had his hair cut.
Mr. Bozeman, was often late arriving at school. This was reported by the Head-Teacher of the Bethlehem School.
We have around thirty five or more white students transfering (sic) out of our school district into the Gilmer school this coming year. We will have about 45% white and 55% negro. The Union Hill School is going to have to have the best of teachers and be able to sell the School Program to the white race or else the Union Hill School will be done away with due to race problems.
Sincerely yours,
Merritt Griffin, Superintendent
Union Hill School
MG/rw

## PROCEEDINGS IN THE DISTRICT COURT

The two teachers brought suit against Mr. Griffin and the Trustees of the Independent School District, individually and officially under Title 28, U.S.C., Section 1343 and Title 42, U.S.C., Section 1981, et seq., for vindication of their rights to continued employment. In that court the plaintiffs complained that the school district and its officials:

(1) had failed to promulgate non-racial criteria for the selection of teachers to be demoted or dismissed in the course of desegregation;

(2) had failed to apply non-racial, objective criteria to all teachers in advance of the desegregation of the district's schools in the autumn of 1968;

(3) had discriminated against the plaintiffs on the basis of race in failing to renew their contracts for the 1968–1969 school year; and

(4) had acted improperly by filling the two vacancies which occurred in August 1968 with white teachers.

The defendants responded by asserting that Mr. Bozeman and Mrs. Sparks had been released for valid, non-racial reasons based upon their performances as faculty members in the employ of the district. In addition, the district took the position that neither plaintiff had ever had any legitimate expectation of continued employment because the district had always operated on a year-to-year contract renewal basis. Finally, the district claimed that Mr. Bozeman had failed to make a diligent effort to obtain other employment as a teacher.

After the complaint was filed discovery proceedings commenced. The defendants propounded written interrogatories to the plaintiffs, among which were the three following:

Interrogatory No. 44.

Q. Do either or both of you contend that the manner in which your contracts were not renewed in the Union Hill Independent School District was any other than the customary and regular and usual manner in which the Union Hill Independent School District considers the contracts of teachers in the renewal or non-renewal of the same?

A. No.

Interrogatory No. 49.

Q. Do either or both of you contend that the method used to notify you in the Union Hill Independent School District that your contracts had not been renewed was other than the usual and customary and regular manner in which teachers are so notified in said school district?

A. No.

Interrogatory No. 52.

Q. Do either or both of you contend that you were treated in a manner different from any other teachers in the Union Hill Independent School District with respect to the non-renewal of contracts?

A. No.

Following trial, the district court adopted verbatim *in toto* the proposed findings of fact and conclusions of law tendered by counsel for the defendants-appellees. The district court found, *inter alia*:

(1) Before deciding not to renew the contracts of Mr. Bozeman and Mrs. Sparks, the board made a fair and impartial comparison of the qualifications of these plaintiffs by definite objective standards with the qualifications of all the other teachers in the district on that date.

(2) The plaintiffs admitted that they had not been discriminated against on the basis of race and the district's board did consider the plaintiffs' membership in the black race in making its determination not to renew their contracts.

(3) Following oral notification that their contracts for the 1968–1969 school year had not been renewed, neither plaintiff asked for a hearing be-

fore the board or asked to discuss the matter with the Superintendent.

(4) Both plaintiffs knew that they should have invoked their local administrative remedies if they were dissatisfied with the board's failure to renew their contracts.

(5) Neither plaintiff testified as to any facts which would show racial discrimination against them.

(6) Mrs. Sparks failed to make a diligent effort to secure other employment for the 1968–1969 school year and Mr. Bozeman failed to make a diligent effort to obtain other teaching employment.

The district court concluded:

(1) The plaintiffs did not have tenure or a reasonable expectancy of continued employment with the Union Hill Independent School District.

(2) The contracts of the plaintiffs were not renewed for good cause shown.

(3) In the absence of constitutionally impermissible reasons for the nonrenewal of their contracts and an expectancy of continued employment on the part of the plaintiffs, the plaintiffs were not entitled to a hearing before the board.

(4) The plaintiffs waived any right to object to the manner in which they were treated by the school district by failing to demand a hearing before the board.

(5) There was no conspiracy or plan to deprive the plaintiffs of their rights, privileges and immunities under the laws and Constitution of the United States.

(6) The plaintiffs were not entitled to reinstatement, back pay, injunctive relief, or any other relief.

Final judgment was entered against the plaintiffs, with costs.

## CONTENTIONS OF THE PARTIES ON APPEAL

The plaintiffs-appellants challenge on this appeal the district court's failure to apply the guidelines of Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 419 F.2d 1211, cert. denied 1970, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530, to the facts before it in this case. Further, they assail as clearly erroneous the district court's finding that the school district's failure to renew their contracts was not racially motivated. Finally, they urge error in the district court's several rulings that the plaintiffs-appellants had no expectancy of continued employment in the Union Hill Independent School District (thereby rendering them not entitled to a prior hearing), that Mr. Bozeman failed to make a diligent effort to obtain other employment as a teacher, that Mrs. Sparks was not entitled to reinstatement, and that Mr. Bozeman was not entitled to reinstatement with back pay.

The school district, whose counsel authored the district court's findings of fact and conclusions of law, endorses the rulings of the court below as correct.

## DISCUSSION

The obvious starting point for our analysis of the facts of this case must be this Court's en banc decision in *Singleton,* supra, and the guidelines there enunciated. With respect to personnel dislocations caused by desegregation, we stated:

"2. Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color or national origin.

3. If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addi-

tion if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

Prior to such a reduction, the school board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee." 419 F.2d at 1218.

The *Singleton* decision was handed down on December 1, 1969, while the plaintiffs-appellants' contracts were not renewed by the board of the Union Hill Independent School District on March 25, 1968. The retroactivity of the *Singleton* criteria was considered by this Court in Lee v. Macon County Board of Education, 5 Cir. 1971, 453 F.2d 1104. Judge Goldberg's opinion for the Court summarized the facts of that case as follows:

"Charles Carter was removed in 1967 as principal of an all-black school pursuant to a court desegregation order that required the closing of his school. Lee v. Macon County Board of Education, M.D.Ala.1967 [, C.A. No. 604–E]. The white principals were retained or replaced with other white principals. From 1967 to 1971 principalships in three of Muscle Shoals' four schools became vacant. Charles Carter was not contacted regarding any of the vacancies, and each was filled with a white man or woman. In May, 1971, another principalship vacancy arose in the Avalon Middle School. Again, Carter was not ap-

pointed, the school board choosing instead a white assistant principal from the high school. Alleging that he was denied appointment because of his race in violation of the Constitution and of this court's directives, Carter appeals from the district court's denial of his motion for an order directing the Muscle Shoals school board to appoint him to a position tantamount to the one he had occupied prior to his demotion, specifically to the principalship of Avalon, and to restore to him any back pay and retirement benefits of which he had been unlawfully deprived because of the discriminatory practices of the board. We find that the school board has failed to comply with this court's procedures for the reappointment of principals who are affected by desegregation orders, and we reverse." 453 F.2d at 1106–1107.

The Court held that Mr. Carter's rights under *Singleton* had been violated in May 1971, when the school board refused to appoint him to the principalship of the Avalon Middle School. Accordingly, the Court determined that Mr. Carter was entitled to the principalship of Avalon or to the principalship of another school in the Muscle Shoals System. 453 F.2d at 1112.

The question of Mr. Carter's entitlement to back pay and retirement benefits starting with his dismissal as a principal in 1967 proved to be more difficult of disposal than the question of reappointment as principal. The Court noted:

"The question arises as to whether or not *Singleton* applies retroactively to violations of the precise *Singleton* mandate that occurred prior to the actual decision of that case in 1970. The question is relevant here only as it relates to Carter's damages; his claim for equitable relief is clearly governed by *Singleton,* applied prospectively". 453 F.2d at 1112.

The Court found the *Singleton* procedures not amenable to retroactive application with respect to Carter's entitle-

ment to back pay and retirement benefits upon the following reasoning:

"While the rationale and thrust of *Singleton* is substantive, in the sense that it propounds the law as it substantively existed prior to 1970, there is also a substantial procedural element to the actual holding of *Singleton* that is not amenable to retroactive application. *Singleton* held that any hiring of principals or teachers of another race from outside the pre-desegregation order populations of principals and teachers was a per se violation of the constitutional rights of those principals or teachers who were within the pre-desegregation order populations. The only way that a school board could pass over a member of the pre-order population would be to take that member out of the protective penumbra of *Singleton* altogether by establishing that the principal or teacher was not 'demoted' or 'dismissed,' or that the principal or teacher was not 'qualified,' factors which we have already discussed in greater detail. The specific per se case of *Singleton* is more procedural than substantive in its protection of the Fourteenth Amendment rights of principals and teachers affected by desegregation orders, even though the substantive thrust of *Singleton* is clearly an exposition of pre-*Singleton* law. *Singleton's* novelty is procedural in the very sense of that per se pitch, for, if the facts of a case fall within the ambit of *Singleton,* the board is given no authority to explain its failure to reinstate. . . . . But we must take cognizance of the fact that some school districts could conceivably have passed over demoted or dismissed applicants of one race in order to hire applicants of another race whom the board, in good faith and without racial discrimination, considered 'more qualified' than the earlier principals or teachers. . . .

"Carter may still recover damages, in the form of lost pay and lost retirement benefits, for events that trans-

pired between 1967 and 1971, but he cannot base his claim *solely* on the *per se aspect of Singleton.* Pre-*Singleton* law does provide 'other safeguards' to protect the Fourteenth Amendment rights of demoted or dismissed principals. . . . Where the educational processes had historically been segregated, the pre-*Singleton* law of this court cast the burden [of persuasion] onto the [defendant] school board to prove that its hiring practices were non-discriminatory. . . . " 453 F.2d at 1112–1113.

Citing this Court's decision in United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836, affirmed en banc, 5 Cir. 1967, 380 F.2d 385, cert. denied 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103, as typifying the placement of the burden of proof upon the school board to establish the absence of racial discrimination in pre-*Singleton* personnel controversies, the Court in *Lee,* supra, remanded the matter to the district court to "determine the question of Carter's damages, in the form of lost back pay and retirement benefits, that allegedly occurred between 1967 and 1970 under the *Jefferson criterion".* 453 F.2d at 1114. Finally, the Court held that Carter was entitled to recover damages relating back to the May 1971 denial of his application for the principalship of the Avalon Middle School, computed from the date on which he would have assumed that position had there not been racial discrimination in the hiring and reinstatement process. 453 F.2d at 1115.

The vacancies created by the failure of the district's board to renew the contracts of the plaintiffs-appellants in this case were filled in August 1968, by the hiring of white applicants from outside the pre-desegregation population. Even though these hirings were effectuated prior to the rendition of the *Singleton* decision, we believe that under the pre-*Singleton* law, as amplified by the decision in *Lee,* supra, Mr. Bozeman and Mrs. Sparks are entitled to reinstatement in their former positions as mem-

bers of the faculty of the Union Hill Independent School District. We reject as clearly erroneous the district court's findings that the district's board voted not to renew the contracts of the plaintiffs-appellants for the 1968–1969 academic year on the basis of non-racial, objective, and reasonable criteria. It is undisputed that the administration of the Union Hill Independent School District tolerated the alleged shortcomings in the performances of the plaintiffs-appellants for extended periods of time but drew the line only when true desegregation of the district was about to become a reality.

The conclusion that the non-renewals of these two teachers was in fact racially motivated is compelled by the surrounding circumstances. Mr. Griffin's letters to a HEW official, footnote 1, supra, convincingly demonstrate racial bias. Each plaintiff-appellant was dismissed from the faculty solely upon the basis of informal evaluations submitted to the district's board with no advance warning that such action was contemplated. In the case of Mr. Bozeman, the defendants conceded that a reduction in the ADA caused by desegregation was a proximate cause of his release. In the case of Mrs. Sparks, in the words of Mr. Griffin, it was believed:

"Mrs. Sparks, has a language problem. She cannot help the negro dialect, but it is certainly bad for the children to be subjected to it all day." See Note 1, supra.[2]

■■ We now address ourselves to the bases, other than the fairness of the evaluation by the defendant-trustees of the performances of the plaintiffs-appellants, utilized by the district court in support of its denial of relief to the plaintiffs-appellants. With respect to the district court's determination that the plaintiffs-appellants had failed to pursue their local administrative remedies, it is no longer arguable that exhaustion of state administrative remedies is not required of a party seeking relief under the federal civil rights statutes. Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; McNeese v. Board of Education, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622; and Damico v. California, 1967, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647. The failure of the plaintiffs-appellants to request hearings before the board of trustees of the Union Hill Independent School District does not, therefore, preclude them from seeking relief in the federal courts.

■■ The district court ruled that neither plaintiff-appellant had any legitimate expectancy of continued employment by the Union Hill Independent School District because neither one had tenure and it had long been the custom to reconsider the contract of every teacher in the district on an annual basis. While the expectancy of continued employment has been an important issue in several decisions of this Court dealing with public educational institutions, see, e. g., Sinderman v. Perry, 5 Cir. 1970, 430 F.2d 939, cert. granted 1971, 403 U.S. 917, 91 S.Ct. 2226, 29 L.Ed.2d 694 (alleged refusal to renew teaching contract because of teacher's exercise of First Amendment rights), we have never recognized the relevancy of this concept to school desegregation proceedings. The plaintiffs-appellants in this case, both blacks, have charged that their contracts were not renewed for the 1968–1969 academic year for racially discriminatory reasons. The mere fact that they were not offered new contracts for the following school year rather than being dismissed outright does not limit their right to seek relief under the controlling decisions of this Court.

■ Both the school district and the district court below placed great reliance upon the plaintiffs-appellants' answers to Interrogatories numbers 44, 49 and

2. With no disposition to be unkind, we question, based on the spelling and composition of the two letters, copied in Note 1, the ability of Mr. Griffin to diagnose a "language-problem".

**443**

52, supra, page 10. On the basis of these responses, the district court found that the plaintiffs-appellants had admitted that they had received fair and proper treatment at the hands of the Union Hill Independent School District. Our interpretation of the responses differs from that of the court below. The interrogatories involved were ambiguous to the extent that they may have asked the plaintiffs-appellants if they believed that the manner in which the district's board rendered its decision on the contract renewals was in any manner procedurally defective. Because this suit was brought for the express purpose of challenging the refusal on a racial basis of the board to renew their contracts for the 1968–1969 school year, we refuse to hold that the answers to the referenced interrogatories bar the plaintiffs-appellants from obtaining relief. The plaintiffs-appellants' answers did not constitute binding concessions of racially non-discriminatory treatment on the part of the school district officials.

The district court, as noted above, held that Mrs. Sparks did not make a diligent effort to secure other teaching employment for the 1968–1969 school year and that Mr. Bozeman made no meaningful attempt to obtain teaching employment following his release from the Union Hill Independent School District. On that basis, in addition to the finding of no racial discrimination, the court below declined to award back pay to either plaintiff.

Only Mr. Bozeman asks this Court for an award of back pay. At trial, Mr. Bozeman testified that he sent written applications to two school districts, Weslaco and Dallas, that he had talked to the superintendent at Cason, and that he had also inquired about vacancies in the area through teachers and former teachers, all black, who had been released in Diana, Gilmer, and other places. The district court concluded that Mr. Bozeman's efforts to find other teaching employment were insufficient.

On this appeal, the appellees do not claim that at trial it was proved that there were teaching jobs available for which Mr. Bozeman would have qualified had he applied. It merely asserts that Mr. Bozeman did not expend sufficient effort to find other teaching employment. The appellees' position is without legal justification. As the Eighth Circuit held in Hegler v. Board of Education of the Bearden School District, 8 Cir. 1971, 447 F.2d 1078, 1081:

> "The defendant-appellee (school board) has to show not only that the plaintiff-appellant failed to use reasonable care and diligence, but that there were jobs available which appellant could have discovered and for which she was qualified".

### CONCLUSION

The plaintiffs-appellants were subjected to racially discriminatory action when the board of trustees of the Union Hill Independent School District, on March 25, 1968, refused to renew their teaching contracts for the next school year and when the board hired two white teachers in August 1968. The judgment of the district court is reversed and the cause is remanded with directions to order the Union Hill Independent School District to extend offers of reinstatement to each plaintiff-appellant. The offers of reinstatement shall be to positions equal to or more responsible than the ones occupied by the plaintiffs-appellants prior to the 1968–1969 school year. The district court is additionally directed to award damages for lost back pay to Mr. Bozeman for the period commencing September 1, 1968. From this award, deductions may be made for earnings during the period covered.

Reversed and remanded, with directions.