Mrs. Travistine **ALEXANDER**, Appellant,

v.

The **WARREN, ARKANSAS, SCHOOL DISTRICT NO. 1 BOARD**, et al., Appellees.

No. 72–1060.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1972.

Decided July 24, 1972.

James I. Meyerson, NAACP, New York City, George Howard, Jr., Pine Bluff, Ark., Nathaniel R. Jones, NAACP, New York City, for appellant.

H. Murray Claycomb, Warren, Ark., for appellees.

Before ROSS and STEPHENSON, Circuit Judges, and DAVIES, District Judge.

ROSS, Circuit Judge.

Mrs. Travistine Alexander, a black elementary school teacher in the Warren, Arkansas School District, appeals from the trial court's dismissal of her action

alleging that the school board discriminated against her on racial grounds when it did not renew her teaching contract for the 1970–71 academic year. Mrs. Alexander claimed the school board's refusal to rehire her was arbitrary, irrational, and racially motivated, in violation of the thirteenth and fourteenth amendments and in violation of 42 U.S.C. §§ 1981 and 1983. We affirm the trial court's judgment dismissing the action.

At the time of her termination, Mrs. Alexander had twenty-seven years of experience in her profession, nineteen years of which were in the Warren school system. She possessed a valid teaching certificate issued by the State of Arkansas. Except for the year 1969–70, Mrs. Alexander had taught in the all black schools of the Warren district. During her tenure in the black schools, she had never been questioned as to her ability to teach.

Prior to the academic year 1969–70 the Warren school system had operated in an essentially segregated manner. Commencing with the school year of 1966–67 the school board adopted a "freedom of choice" plan for its students. In 1968–69 the school board adopted a unitized plan which was not put into effect until the following year due to litigation brought against the board by white patrons of the district. See United States v. Lovett, 416 F.2d 386 (8 Cir., 1969). Thus the academic year 1969–70 was the first year of integration.

Shortly before the 1969–70 school year was to begin, the school district held a two-day workshop for teachers. Mrs. Alexander testified that one of the purposes of the workshop was to "get the teachers in readiness to accept each other." School children were placed in classes with regard to the proportion of whites to blacks, as well as in relation to sex and previous academic performance. Teaching assignments were made on a random basis.

The superintendent testified that early in this first year of integration, he began to receive complaints from white parents about Mrs. Alexander's teaching. On September 26, 1969, the superintendent had a conference with Mrs. Alexander about the complaints. A similar conference was held in either October or November of 1969. On April 9, 1970, Mrs. Alexander was notified that she would not be rehired.

Two hearings were held before the school board relative to the termination of the services of Mrs. Alexander; one was private and the other was public. At the public hearing Mrs. Alexander was represented by a Mr. Patterson, head of the Human Rights Division of the Arkansas Education Association. From the transcript of the hearing, it appears that Mr. Patterson had the opportunity to make a statement and to ask questions of both the principal and the superintendent.

When the school board refused to renew her contract, Mrs. Alexander brought this action. The trial court found that the school district had a long history of segregation, that there had been a decrease in the number of black teachers, and, depending upon the interpretation of the word "significantly," the proportion of the black faculty to white faculty was significantly less than the proportion of black to white students. Consequently, on the authority of Moore v. Board of Education, 448 F. 2d 709, 711 (8th Cir. 1971), the trial court found that Mrs. Alexander had met her burden of establishing discriminatory action on the part of the school board. The burden thus shifted to the school board to demonstrate by "clear and convincing" evidence that the dismissal of Mrs. Alexander was not due to racial considerations.

The evidence revealed that Mrs. Alexander was one of six teachers who were not recommended for further employment. After reconsideration by the school board, one white teacher and one black teacher had their contracts renewed. One black teacher's contract was not renewed. And one white teacher and two black teachers resigned, pre-

sumably so their employment records would not reflect the school board's decision not to rehire.

The decision not to recommend that Mrs. Alexander be rehired was based in part on information the principal obtained by classroom observation. These observations were structured around a rating sheet obtained from a school supply house and prepared for each of the teachers by the principal. Black teachers received two of the four highest ratings, while Mrs. Alexander received the second lowest rating. It is noted that the evaluation forms used to rate Mrs. Alexander were incomplete as to the date of evaluation, the number of visits to Mrs. Alexander's classroom, and the length of the observation.

The specific reasons given by the school board for not rehiring Mrs. Alexander were her inability to teach "modern math," poor use of tests and incorrect grading, incorrect use of the language, and failure to maintain discipline. The evidence we deem material to these points may be summarized as follows:

1. Inability to teach "modern math".

The record indicates that Mrs. Alexander did not teach math for part of the year in question. It appears that a Mrs. Lee, a white teacher, approached Mrs. Alexander with the suggestion that she assist Mrs. Alexander in teaching math. This was done after several white students had complained that they did not understand "about math," after Mrs. Lee apparently received complaints from parents, and after she had approached the principal who requested that she help Mrs. Alexander. Although Mrs. Alexander testified that she allowed Mrs. Lee to teach math so as to avoid friction, it appears that Mrs. Lee's class was left without a teacher because Mrs. Alexander remained in her own classroom while Mrs. Lee taught math. It also appears that Mrs. Alexander had taken a course in modern math prior to the 1969–70 school year and that she had previous experience teaching the subject.

2. Poor use of tests and incorrect grading.

A parent testified that with regard to one test she had difficulty understanding it and the test contained a number of typing mistakes. She also testified that she had difficulty at times understanding how a grade was arrived at. The principal testified that he had asked Mrs. Alexander to explain the manner in which a certain grade was arrived at, but she subsequently failed to do so. An analysis of tests prepared by Mrs. Alexander indicates that they contained typographical errors, words were left out of test questions, and there was a failure to separate multiple choice answers from test questions. Mrs. Alexander testified that she did not type all of the tests and when she found a mistake she informed her class of the problem, although other testimony indicated that test preparation was the responsibility of the teacher.

3. Poor use of language.

Further analysis of the tests indicates the use of incorrect verb tense and poor sentence structure. Classroom observation of Mrs. Alexander indicated a lack of clarity of expression and poor use of the language. However, Mrs. Alexander's supervising principal in the black schools testified that he had consistently recommended her and did not remember that she had any language problem.

4. Failure to maintain discipline.

The principal testified that Mrs. Alexander's classroom was in a constant state of noise and confusion. A parent testified that her child complained of noise which made it difficult to hear, although the child sat in the second row of seats. A second parent testified that Mrs. Alexander had struck her child with a ruler. When Mrs. Alexander was asked why she had struck the child, she responded that the room was noisy. A third parent testified that she observed a child recite a math problem from under Mrs. Alexander's desk. On the other hand, a fourth parent testified that she had observed Mrs. Alexander's class-

room three times and on each occasion the room was quiet. The principal rated Mrs. Alexander as very poor with regard to classroom order, poor with regard to maintaining order of students passing in and out of the room, and poor with regard to discipline at noon and recess. It is noted that those parents who testified for the school board and who observed the class, did so at the end of the day. Hence the time of observation may not have been representative in terms of classroom order. Furthermore, Mrs. Alexander's room was near a lavatory, water fountain, and candy machine, thus indicating possible external factors were responsible for at least part of the noise.

■■ Upon all of the evidence, then, the trial court found that the school board had demonstrated by "clear and convincing" evidence that its action was not racially motivated. This finding is challenged by Mrs. Alexander with a request that we define "clear and convincing" as *more* than overwhelming evidence" and should extend to the level of "'beyond a reasonable doubt'". She further suggests that "conflicting testimony in the record must be construed in favor of the plaintiff." However, our need to define the term is tempered with the knowledge that "[e]ach case of this type must be decided upon the basis of its own peculiar facts", Brooks v. School District, 267 F.2d 733, 740 (8th Cir.), cert. denied, 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151 (1959), and we are hesitant to define the phrase in any one verbal formulation. Certainly "clear and convincing" demands more than just a "preponderance of the evidence". On the other hand, the "beyond a reasonable doubt" standard is not appropriate because on balance the need for certainty is not as great as it is when an accused faces the possibility of criminal sanction. *See e. g.,* Hobson v. Eaton, 399 F. 2d 781, 784 n. 2 (6th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969); 30 Am.Jur.2d, Evidence § 1167 at 345–346 (1967). *See also,* J. Wigmore, Evidence § 2498 at 329

(3d ed. 1940) ("a stricter standard" than preponderance of the evidence); C. McCormick, Evidence § 320 at 679 (1954) ("highly probable"). The contention that "conflicting testimony in the record must be construed in favor of the plaintiff" is so patently erroneous that no further discussion is necessary.

With the foregoing in mind, it is helpful to reemphasize some of the evidence which supports the trial court's finding that the Board sustained the burden of proof by clear and convincing evidence. First, the school board, in the words of Mrs. Alexander, attempted to "get the teachers in readiness to accept each other." Moreover, teaching assignments were made on a random basis, black and white children were assigned to classes on the basis of the proportion of whites to blacks, as well as in relation to sex and previous academic performance, and black and white teachers were paired together. The school board's actions in this regard are clearly inconsistent with the theory that black teachers were the subject of racial discrimination.

Second, other black teachers achieved high ratings by the principal. Regardless of the deficiencies the rating system might have had, it would appear that at least some black teachers were being evaluated on other than racial grounds. If the school board was bent upon decimating the ranks of black teachers, it is unlikely that two out of the four highest ratings would have gone to blacks. Furthermore, the fact that two out of the six teachers not recommended for further employment were white also tends to indicate that such decisions were made on other than racial considerations. Where full and fair evaluation of teachers has taken place, dismissal of teachers has been upheld. Thomas v. Board of Education, 457 F.2d 1268, 1271–1272 (8th Cir. 1972); Walton v. Nashville, Arkansas Special School District, 401 F.2d 137, 143–144 (8th Cir. 1968); Brooks v. School District, 267 F.2d 733, 740 (8th Cir.), cert. denied, 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151 (1959). *See also,* Moore v. Board of Ed-

ucation, 448 F.2d 709, 712 n. 6 (8th Cir. 1971).

Third, when the school received complaints about Mrs. Alexander's teaching, she was notified accordingly, and two conferences were held with her in this regard. As opposed to some cases, *see e. g.*, Sparks v. Griffin, 460 F.2d 433 (5th Cir. 1972), it cannot be said that Mrs. Alexander was dismissed without being informed well in advance that her teaching ability had been questioned.

Fourth, there is concrete evidence that Mrs. Alexander made a number of mistakes in terms of grammar and sentence construction when she tested her pupils. In this case, we do not have mere "euphemistic references to actual or assumed racial distinctions", Smith v. Board of Education, 365 F.2d 770, 782 (8th Cir. 1966). On the contrary, we have evidence that the rudiments of correct English usage were being taught incorrectly.

Fifth, there is testimony from parents of school children which strongly indicates that Mrs. Alexander could not maintain classroom order. For example, the observation that a child recited a math problem from under Mrs. Alexander's desk seems to us to be a rather clear indication that discipline was lacking.

■ While we believe that the school board sustained its burden by clear and convincing evidence, we are, nevertheless, troubled by the lack of supervision over Mrs. Alexander for the many years she taught in the black schools. Suddenly, in the first year of integration, a black teacher, who had been consistently reemployed, is said to be incompetent. This Court has been hesitant to allow a school board to sit idly by when its schools are segregated and, then, use a black teacher's shortcomings as a teacher to justify her discharge after the schools have been integrated. *See* Moore v. Board of Education, 448 F.2d 709, 714 (8th Cir. 1971); Jackson v. Wheatley School District, 430 F.2d 1359, 1363 (8th Cir. 1970). Apparently in this case the school board was simply ignorant of what went on in the black schools, or at worst, indifferent to the problems of teachers in these all black schools. While we would not condone this seeming lack of diligence, we cannot say, in light of the extensive evidence of incompetence, that the school board was motivated by racial prejudice when it failed to reemploy Mrs. Alexander.

In conclusion, we have before us a finding of fact, and, as such, we have reviewed the trial court's finding in light of the "clearly erroneous" rule. Fed.R.Civ.P. 52(a). Based upon our consideration of the entire record, we cannot say that we are left with the definite and firm conviction that the trial court was mistaken in its findings. Long v. Board of Education, 456 F.2d 1058, 1059 (8th Cir. 1972).

Judgment affirmed.