Sophia SHORE, Plaintiff,

v.

**FEDERAL EXPRESS CORPORATION,**
**Defendant.**

No. 81–2402–M.

United States District Court,
W.D. Tennessee, W.D.

July 3, 1984.

Katherine Carlyle, and David A. Valander, Memphis, Tenn., for plaintiff.

Louis F. Allen, and Elizabeth McKanna, Memphis, Tenn., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

McRAE, Chief Judge.

This is a civil action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d), in which plaintiff seeks relief for sex discrimination. Jurisdiction of the court is properly invoked.

At the close of plaintiff's proof, defendant's Rule 41(d) motion to dismiss plaintiff's claims under the Equal Pay Act was granted, leaving only the Title VII claims for resolution by the Court.

After hearing and considering the testimony and exhibits, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff, Sophia Shore, is a white female citizen of the State of Tennessee. Defendant, Federal Express Corporation, is a Delaware corporation with its principal place of business in Memphis, Tennessee, and is an employer within the meaning of that term as it is used in Title VII of the Civil Rights Act.

2. Plaintiff holds a high school diploma and has attended one year of college. Plaintiff was hired by defendant in 1975 as a part-time secretary. After being promoted to full-time secretary, she held the respective positions of Acting Personnel Administrator, Policies and Procedures Coordinator, MBO Coordinator and MBO Analyst.

3. Plaintiff and James Bailey began a personal, intimate and illicit relationship in 1970, prior to the time either was employed by defendant. Both plaintiff and Bailey became employed by defendant in 1975, but neither's job had anything to do with the other's until late in 1979.

4. As plaintiff progressed with defendant from a secretarial position through the very responsible position of MBO Analyst, she always received satisfactory to outstanding performance evaluations. Throughout her career, she was commended for her devotion, loyalty and performance. There was not a "black mark" in plaintiff's personnel record with defendant until after she was removed from the MBO Analyst position.

5. During 1978, plaintiff worked as Personnel Policies and Procedures Coordinator in the Personnel Department under the supervision of Harry Keenan, Vice President of Personnel. Harry Keenan is a personnel expert. He was hired by the defendant to develop the most productive personnel pro-

grams, including the MBO Program. During the latter portion of her tenure in that position, plaintiff began to develop and validate the Management By Objectives (MBO) Program at defendant, Federal Express Corporation. Defendant's Management By Objectives Program is a management tool used to set goals for defendant's different managers and then measure performance against the goals. Bonuses are paid to managers based upon their department's performance in achieving the goals.

6. On February 1, 1979, plaintiff was promoted into the newly created position of MBO Coordinator. Plaintiff continued to work under the supervision of Harry Keenan. Although she had no formal training or education in Management By Objectives, plaintiff performed in an extremely exemplary fashion in the coordinator position. Plaintiff was instrumental in developing and implementing the MBO Program for defendant. Her contribution was recognized by Harry Keenan, who felt that plaintiff had "God given talent" which enabled her to do such an excellent job despite her lack of formal training or education (Exhibit 8).

7. According to Keenan, plaintiff was not being compensated appropriately for the work she was doing. He made repeated attempts to get her salary upgraded (Exhibits 2 and 5). Keenan also thought that one of the reasons defendant refused to upgrade plaintiff's salary was that plaintiff was a woman. This is clearly demonstrated in Exhibits 7 and 10. Although defendant's wage and compensation specialist, Steve Priddy, testified that company policy is to evaluate the job and not the individual, defendant rated plaintiff's job based upon its perceptions of plaintiff rather than based upon the duties and responsibilities of the job (Exhibit 2). Priddy was obviously rating plaintiff and not the job, in contradiction to his testimony.

8. In June of 1979, plaintiff was promoted to the position of MBO Analyst, still under the supervision of Harry Keenan. He continued his efforts to get plaintiff's job rating and salary upgraded, but to no avail. Keenan's testimony in court, although complimentary to plaintiff, was not as forceful as he had been in his memos concerning her job performance and his job performance evaluations of plaintiff (Exhibits 1, 6, 7 and 8).

9. During her tenure as MBO Coordinator and MBO Analyst, plaintiff made a unique contribution to the MBO Program. She invented the job and nurtured the MBO Program to fruition. Plaintiff's efforts enabled the MBO Program to develop into the full fledged bonus payment plan that it is today and, according to Keenan, she was an integral part of the success of the program.

10. In November of 1979, Harry Keenan left defendant's employ. In December of 1979, James Bailey, with whom plaintiff had been and continued to carry on an affair, was promoted to Vice President of Objectives and Audits. Bailey thus became plaintiff's immediate supervisor. Prior to assuming his new job, Bailey advised Fred Smith, Chief Executive Officer of Federal Express, that he had previously had an illicit sexual relationship with plaintiff, however, he dishonestly reported that the affair had ended. Even though he was aware of the relationship between Bailey and plaintiff, Smith, nonetheless, promoted Bailey into a position which made him plaintiff's immediate supervisor.

11. When Bailey became plaintiff's immediate supervisor, it was necessary for the plaintiff to teach Bailey about the MBO Program because he had no previous experience in the execution of this Program and plaintiff was intimately familiar with it. Plaintiff's performance continued to be considered excellent. Bailey approved a maximum merit increase for plaintiff in January, 1980.

12. After Bailey became plaintiff's supervisor, he undertook to bring another female, Peggy St. John, into the MBO Department. Bailey was also carrying on a social and personal relationship with St. John. When Bailey told plaintiff that St. John refused to come into the MBO Department as long as plaintiff was there, plain-

tiff telephoned St. John to see if she could "work things out" with her. Plaintiff had a second telephone conversation with St. John during which insults were exchanged. Following that conversation, Bailey became extremely upset with plaintiff and, on February 1, 1980, fired her from her position as MBO Analyst because he was unwilling to continue the relationship with the plaintiff.

13. Plaintiff attempted to appeal Bailey's decision to fire her by requesting a meeting with Fred Smith. Plaintiff had a meeting on February 4, 1980, with Bailey and Jim Perkins, Vice President of Personnel of Federal Express. Prior to the meeting, Bailey met with Perkins and told him that he could no longer work with plaintiff and that he wanted her out of the Department. During the meeting with Bailey and Perkins, plaintiff became emotional and got on her hands and knees and begged for her job, stating that she had done nothing to warrant being fired by Bailey. Perkins, who did not understand why plaintiff wanted to remain in MBO when Bailey, her supervisor, wanted her out, did not allow plaintiff to explain her side of the story. Perkins stated that the defendant's employee handbook and the grievance/review procedures contained in it did not apply to plaintiff's situation. When he learned that Bailey and plaintiff were to meet with Fred Smith the next day, Perkins washed his hands of the entire situation, thereby totally neglecting his duties as personnel officer.

14. The next day, on February 5, 1980, plaintiff and Bailey were scheduled to meet with Fred Smith. Bailey had a preliminary meeting with Smith, during which he informed Smith about the "problem" that had arisen.

There were three versions of what occurred during the meeting where Smith, Bailey and the plaintiff were present. Both Bailey and plaintiff testified that although she tried to explain her side of the story, she was not allowed to do so. Smith, like Perkins, told plaintiff that the employee handbook did not apply to her. The handbook itself, however, clearly states that the defendant's Problem and Complaint Procedure may be invoked when a problem arises which "may be based on a personal problem" (Exhibit 15). Smith made it plain to plaintiff that he felt Bailey's role in MBO was more important than plaintiff's, although Smith may not have realized that it was not. After plaintiff had been denied the opportunity to explain and after Smith had lauded the virtues of having Bailey in the Department, it was clear to plaintiff that both Perkins and Smith were going to side with Bailey in the dispute, that no one was going to listen to her side of the story and that she was not going to be allowed to exercise her rights as specified in the employee handbook. Smith and Bailey testified that plaintiff "volunteered" to leave the MBO Department. Plaintiff testified that Smith told her that she was being removed from her job. Smith did promise plaintiff that he would find her a comparable position in defendant's organization, then concluded the meeting by sending Bailey back to work and telling plaintiff to "go shopping." Both Smith and Bailey applied the age old double standard, namely, that the male is forgiven for illicit sex and the female is not.

15. Bailey has not been disciplined by defendant in any manner for his part in the affair, the disruption in the workplace, or for lying to Smith about the status of the affair. His performance reviews since plaintiff was fired have been high. Today he still holds his position with defendant.

16 Plaintiff's replacement in the MBO analyst job was Sharon Howes, who had come into the MBO Department as a secretary shortly before plaintiff was fired. Howes testified that she got along well with plaintiff in the workplace prior to plaintiff's removal.

17. The Court finds Bailey's testimony that plaintiff was subjecting him to sexual blackmail to be so preposterous as to undermine his other testimony.

18. After plaintiff's removal from the position of MBO Analyst was ratified by

the Chief Executive Officer, plaintiff became a "displaced person", still employed by defendant but assigned no job duties other than to seek a comparable position in defendant's organization. She remained on call but was asked to perform no other job duties. As Ann Mullins of defendant's Personnel Department testified, plaintiff maintained close contact with defendant's Personnel Department in an effort to find a comparable job. She received full salary and benefits during this period.

19. Defendant offered plaintiff a position as a Hazardous Materials Specialist. However, the Court finds that this job was not comparable to the position of MBO Analyst. It required re-training and had nothing whatever to do with management by objectives. Steve Priddy testified that defendant uses the Hay system to rate its jobs. He testified that the three areas considered when ranking a job under the Hay system are 1) know how, 2) problem solving, and 3) accountability. He testified that under criteria 1) and 2), the hazardous materials specialist job is not comparable to plaintiff's MBO job. The only similarities between the two jobs are grade level and pay, according to Priddy. Furthermore, defendant acquiesced in plaintiff's rejection based on noncomparability and continued to assist her in attempting to find a comparable job.

20. Plaintiff applied for the job of Manager, HUB Administration. Defendant requires applicants for that job to have a bachelor's degree, which plaintiff does not have. She was refused that job.

21. During the time when plaintiff was a displaced person, Bailey went to Smith to seek approval for an additional Quality Assurance Auditor position. He succeeded in obtaining approval for this position ahead of the time it was originally scheduled to be approved. The job required whoever filled it to travel out of Memphis four days per week. Once the job was approved by Smith, it was offered to plaintiff, even though the position reported to Bailey. Bailey thought that by giving plaintiff this job, he could get her out of his life—he had already succeeded in getting her out of the MBO Department. The Court finds that the Quality Assurance Auditor job was not comparable to plaintiff's MBO job and Bailey was trying to send her to Siberia with this wicked scheme. Again, Priddy testified that based upon the first two criteria of the Hay system, the two jobs are not comparable. Again he testified that the only similarities were grade level and pay.

22. After plaintiff initially refused the Quality Assurance Auditor job, she was presented with an ultimatum. She could either accept the Quality Assurance Auditor job or she would be terminated. When plaintiff did not accept the job, they allowed Bailey to terminate her employment with defendant effective June 13, 1980 (Exhibit 20).

23. During the period when plaintiff was a displaced employee, Willie Shotwell, Personnel Manager for defendant, who knew none of the details surrounding plaintiff's removal from MBO, began to question why plaintiff had been removed (Exhibit 13). He tried to get defendant to abide by the employee handbook and grant plaintiff a Board of Review (Exhibits 16 and 17). When Shotwell made his inquiries, Bailey attempted to justify his removing plaintiff from the MBO Department by degrading her work there. Yet, earlier Bailey signed blank job change applications for plaintiff extolling her virtues (Exhibit 12). Also, Bailey refused to cooperate with Shotwell in Shotwell's attempt to determine what had happened to plaintiff (Exhibit 13). Plaintiff was not granted a Board of Review.

24. After plaintiff was fired by defendant, she sought and obtained several jobs, each in a secretarial position. She applied, unsuccessfully, for a management position with Guardsmark Inc. by speaking with the president of that company. She is presently employed as a legal secretary at a salary of $1,200 per month. Since her termination from defendant's employ, she has earned $31,504 in wages.

## CONCLUSIONS OF LAW

■ 1. On the issue of whether plaintiff's job was undervalued because she is a woman, the Court finds that when plaintiff first assumed the position of MBO Coordinator in February, 1979, her job was undervalued and should have been rated as a Level 23 rather than a Level 21 job. However, this discrimination may not be redressed by the Court because defendant argues it was not the subject of a timely filed EEOC charge. Thus, plaintiff is awarded no back pay for the period when she held the job of MBO Coordinator and was underpaid because she is a woman.

2. Once plaintiff was promoted to the position of MBO Analyst, she received pay at Level 23. The proof does not support a finding that plaintiff's analyst position was undervalued.

■ 3. On the issue of plaintiff's discharge, the Court finds in plaintiff's favor. Contrary to defendant's assertions, the meeting between plaintiff, Bailey and Smith did not result in plaintiff's voluntary, uncoerced resignation from her MBO position. She had already been removed from her MBO position by the Vice President of Objectives and Audits and the result of the meeting with Smith was a confirmation and ratification of that action. This is a classic case of disparate treatment based on sex. There are two individuals, plaintiff and James Bailey, who were involved in an illicit affair which resulted in a disruption in the workplace. While plaintiff, the woman, has lost the job she worked so hard to develop, Bailey, the male, has not been disciplined at all for his part in the affair or for his misleading defendant about the status of the affair when he was originally considered for the position as plaintiff's immediate supervisor. See *Rohde v. K.O. Steel Corporation, Inc.*, 649 F.2d 317 (5th Cir.1981). Furthermore, he was authorized to try to get rid of her by assigning her to a traveling job. Defendant, through Fred Smith, the Chief Executive Officer; Jim Perkins, the Vice President of Personnel; and James Bailey, the Vice President for Objectives and Audits; has indulged in the age-old discrimination against women based on a double standard. Such discrimination is in direct contravention of the principles of Title VII. Plaintiff made out a prima facie case of sex discrimination. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ The burden then shifted to defendant to articulate some legitimate nondiscriminatory reason for plaintiff's discharge *Burdine, supra*. Defendant claimed that plaintiff was discharged for refusing to accept a comparable job, the job of Quality Assurance Auditor. The burden then shifted to plaintiff to show by a preponderance of the evidence that defendant's proffered reason was pretextual. *Id.* The Court concludes that defendant's proffered reasons for plaintiff's discharge are pretextual. Of course, plaintiff bears the burden at all times of convincing the Court by a preponderance of the evidence that she was discriminated against because she is female. The Court concludes that plaintiff has demonstrated such discrimination by an overwhelming preponderance of the evidence. The Court finds that Bailey's after-the-fact attempt to justify his removing plaintiff from her MBO position to be as uncredible as his testimony (Exhibit 18). After approving a maximum merit increase for plaintiff in January of 1980, Bailey's later attempts to denigrate plaintiff's work are clearly unworthy of credence. The jobs offered plaintiff by defendant were not comparable to her MBO position. Thus when defendant discharged plaintiff, allegedly for refusing a comparable job when the true goal was to send her to Siberia, defendant compounded and ratified its earlier discriminatory actions.

■ 4. Because of defendant's unlawful discrimination, plaintiff is entitled to full back pay, less mitigation, from the date of her discharge to the present. *Rasi-*

*mas v. Michigan Department of Mental Health,* 714 F.2d 614 (6th Cir.1983). The Court finds that plaintiff is also entitled to interest on the back pay award. *See Taylor v. Philips Industries,* 593 F.2d 783 (7th Cir.1979); *Sparks v. Griffin,* 460 F.2d 433, 443 (5th Cir.1972); *Hegler v. Board of Education,* 447 F.2d 1078, 1081 (8th Cir.1971).

5. The Court finds that plaintiff has fully complied with her duty to mitigate by seeking and accepting interim employment. *Id.; EEOC v. Ford Motor Co.,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). Defendant is entitled to set off from the award the sum of $31,504, the amount plaintiff has earned since her discharge. *Ford Motor Co., supra.* Plaintiff's back pay is not tolled as a result of these two job offers. The burden is on defendant to reduce plaintiff's back pay award from failure to mitigate, and defendant has failed to carry its burden. *Rasimas, supra.* Defendant is not entitled to set off any amounts received by plaintiff as unemployment compensation. *Id.*

6. Plaintiff has diligently and earnestly sought reinstatement throughout this litigation. However, because of the hostility of defendant toward plaintiff, the Court finds reinstatement would be inappropriate in this case. Additionally, reinstatement would require the displacement of a non-culpable employee, Sharon Howes, who has held the position of MBO Analyst since plaintiff's discharge. In lieu of reinstatement, the Court awards plaintiff five years front pay. *See Fitzgerald v. Sirloin Stockade, Inc.,* 624 F.2d 945, 957 (10th Cir.1980).

7. The parties have stipulated that a gross back pay figure of $90,093 is correct, that the benefit calculations of $12,883 are correct, and that the monthly salary of $2,348 used to calculate front pay is correct. However, the Court concludes that this amount should be diminished by $1200, her present savings. Plaintiff is awarded gross back pay in the amount of $90,093, which includes salary plus cost of living adjustments and merit increases from 1980 to the present based upon her salary at the date of her discharge. Plaintiff is awarded interest on back pay less amounts earned in mitigation during each calendar year from 1980 to the present. The total interest award is $17,472 and is calculated based upon the statutory post judgment rate, 28 U.S.C. § 1961 (1983). Fringe benefits are not included in calculating interest. Plaintiff is entitled to an award for fringe benefits in the amount of $12,883. *Rasimas, supra; Pettway v. American Cast Iron Pipe,* 494 F.2d 211, 263 (5th Cir.1974). This amount, as stipulated, includes pension, profit sharing, medical and dental, and bonuses. Plaintiff is awarded five years front pay totaling $68,880. *Fitzgerald, supra.* The front pay award does not include increases or fringe benefits and is based upon the monthly salary plaintiff would have been making as of March, 1984, were she still employed by defendant, as stipulated by the parties. The front pay award does not include inflation, nor is it reduced to present value as these are offsetting calculations.

The total award to plaintiff is $157,829, calculated as follows:

| TOTAL AWARD | | |
|---|---|---|
| Gross Back Pay | $ 90,093 | |
| Interest | 17,472 | |
| Fringe Benefits | 12,883 | (with front pay of |
| Mitigation | (31,504) | more than 9 months) |
| Net Back Pay | $ 88,944 | (with front pay of |
| | | more than 9 months) |
| Front Pay (5 years) | 68,880 | |
| TOTAL DUE PLAINTIFF | $ 157,829 | |

Since more than 9 months front pay has been awarded, plaintiff does not receive credit for vacation and personal days for 1984, as stipulated by the parties

8. As the prevailing party in this action, plaintiff is also entitled to an award of costs and reasonable attorneys' fees. 42 U.S.C. § 2000e–5(k). The parties are directed to attempt to agree on the amount of costs and attorneys' fees due plaintiff. If no agreement is reached within ten days of the docketing of this opinion, plaintiff's attorneys are directed to file a motion for

attorneys' fees and costs with appropriate supporting documentation.

IT IS SO ORDERED.